MRS. OLLIE SHOCKLEY, *et al. v.* MORRISTOWN PRODUCE & ICE COMPANY.*

(*Knoxville.* September Term, 1928.)

Opinion filed December 8, 1928.

---

*As to what injuries "arise out of and in the course of the employment" see annotation in L. R. A., 1916A, pp. 40, 232, 320; L. R. A., 1917D, 114, 120; L. R. A., 1918F, 896; 28 R. C. L., 801; 3 R. C. L. Supp., 1596; 4 R. C. L. Supp., 1856; 5 R. C. L. Supp., 1568; 6 R. C. L. Supp., 1756.

*Corpus Juris-Cyc References: Evidence, 22CJ, section 27, p. 84, n. 71; Workmen's Compensation Acts, CJ, section 64, p. 73, n. 80; section 65, p. 76, n. 93; section 112, p. 115, n. 26; section 114, p. 116, n. 43.

McMahan & Pierce, for complainant, appellant.

W. N. Hickey, for defendant, appellee.

Mr. Justice Chambliss delivered the opinion of the Court.

This is a suit under the Workmen's Compensation Statute. The facts, as found by the Chancellor, are as follows:

"The complainant, Mrs. Ollie Shockley, is the widow of W. P. Shockley, deceased. Jesse, Joseph and Beaman Shockley, who sue by their next friend, are minor children of W. P. Shockley and Ollie Shockley, and all dependents of W. P. Shockley. The said W. P. Shockley at the date of his death and prior thereto was employed under contract regularly by defendant Company, and had been for nineteen or twenty years. A part of the business of the defendant corporation was to buy, sell and ship live stock. Shipments of produce were made to foreign markets and in so doing they would send some one with the car to feed, water and care for said produce. Any one doing this work was known as a caretaker. Mr. W. P. Shockley was employed under contract by said Company as a utility man, and as such received $3.50 per day while working for defendant around its place of business in Morristown. In addition to the above work he made many trips for said Company to eastern markets, as caretaker, and for each of these trips as caretaker he received an additional sum of $85 per trip; he paying his expenses.

"On July 30, 1927, W. P. Shockley under direction of the defendant, Morristown Produce and Ice Co., was placed on Poultry car L. P. T. No. 1827 at Morristown,

Tenn., as caretaker which car was consigned to S. Werner, Jersey City, routed over the Southern Railway.

"On July 31, 1927, car L. P. T. No. 1827 left Spencer, N. C., at three P. M. for Monroe, Va. The train, being extra No. 4846 was in charge of Conductor J. L. Smith, and the poultry car at that time was in charge of W. P. Shockley, caretaker. Car L. P. T. No. 1827 was the second car from the caboose. Train No. 4846 reached a point known as Montview Yards, Va., about 9:15 P. M. on July 31, 1927; the train then being about thirteen miles from Monroe yards and three miles from Lynchburg. Train 4846 stopped at Montview for the purpose of cooling or packing a hot box, leaving this station about 9:20 P. M. When the train stopped in Montview, the conductor left the caboose and walked up some fifteen cars, passing car L. P. T. No. 1827. At this time the conductor spoke a few words to W. P. Shockley in passing, and he (Shockley) was sitting in the state room of car L. P. T. No. 1827. The second car ahead of L. P. T. No. 1827 was loaded with watermelons. The second car ahead of the poultry car being No. 28630. The side door of this car bulged and the end door broke out at A-end. The train in question with the car in question left Montview about 9:30 P. M. July 31st. On August 1st the yard Clerk at Montview found about daylight, on the northbound track a lantern, a cap and a watermelon, and on the inside rail on the northbound track he found some flesh and a couple of human toes. The cap and toes were afterwards identified as the property of W. P. Shockley. The above articles were not more than nine feet apart. Train No. 4846 pulling car L. P. T. No. 1827 arrived at Monroe at 9:50 P. M. Mr. W. P. Shockley was not seen from the time he reached Montview until the train arrived at

Monroe about 9:50 or 9:55. When Mr. Shockley was next seen he was lying on top of his car with his head near the running board and his feet close to the edge of the car. The right foot or a good portion of it was ground off; his right hip was fractured; the right ankle had a commuted fracture. He was carried to the hospital in Lynchburg where he died from the effect of said injuries on August 6, 1927.

"The record further discloses the following competent facts and circumstances, that is to say, that W. P. Shockley was employed by the defendant; that his employment was for the purpose of traveling upon freight train No. 4846; that it was a Southern Railway train; that he was assigned by his employer to car L. P. T. 1827, as caretaker; that his duties, as caretaker were to look after, care for, feed and water the live poultry in said car from Morristown, Tenn., to its destination.

"The circumstances further disclose that some one of the wheels of train No. 4846 ran over part of his foot cutting off his toes, and that the accident occurred in Montview Yards, Va.; that the accident happened in the nighttime; that no one saw Mr. Shockley receive the injuries; that he was last seen sitting in car L. P. T. No. 1827 about eight minutes before the train pulled out of said yard at Montview. That Mr. Shockley was sitting in the west door of said car. That as the train pulled into Monroe, thirteen miles beyond Montview a call was heard, 'Oh Conductor.' That Mr. Shockley a few minutes later was found on top of car L. P. T. 1827 on the east side of the running board, which is in the middle of the car, with injuries as heretofore related."

In disposing of the cause the Chancellor said: "Was W. P. Shockley's death caused by an accident arising out

of and in the course of his employment as an employee of the Morristown Produce & Ice Co.? The Court is of the opinion that Mr. Shockley's injuries in a sense arose out of his employment because had he not been employed as a caretaker on L. P. T. car 1827 leaving Morristown destination Jersey City over the Southern Railway, he would not have been carried to Montview. The Court however is of the opinion that those who are entitled to compensation under the Workmen's Compensation law of this State must receive the injury while doing something incident to or connected with their employment, or which is reasonably necessary and preparatory to the beginning of their work or something reasonably connected with their employment; that the burden of proof is upon the petitioners to show these facts by direct or circumstantial evidence. The Court therefore cannot find that the death of W. P. Shockley was caused by accident arising out of and in the course of his employment from the circumstances in this cause. As a matter of fact there are very strong circumstances in this record relative to the time, place, condition and articles found at the place where the accident actually occurred which rebutted this theory. It results therefore that complainant's petition will be dismissed with cost.''

From the foregoing finding of facts it will be seen that a *prima-facie* case for the claimant, on whom rests the burden of showing that the accident arose out of and in the course of the employment of Shockley, is thus supported:

(1)   The necessary relationship between employer and employee at the time of the injury clearly appears.

(2)   Death is proven from accidental injury while on or about the place of employment, and as a result of con-

tact with the identical mechanical instrumentality with which he was employed to deal; the injuries being of a character which preclude all questions of intentional or self inflicted injuries.

(3) Also, we have an express stipulation excluding as a ground of defense wilful misconduct which had been relied on in the answer of the defendant.

(1) However, for the defendant it is said that the evidence shows that the injury was received while and when Shockley was on a mission personal to himself, he having temporarily departed from the line or scope of his employment. Now, as to this insistance, the burden of producing evidence to meet or overthrow the *prima-facie* case for award falls upon the defendant. This is the rule, thus stated in Corpus Juris (Workmen's Com. Act, Adv. sheets, paragraph 118) : "Where the claim is by a dependent of a workman who was accidentally killed and whose evidence is therefore not available, if facts are proved, the natural and reasonable inference from which is that the accident happened while the deceased was engaged in his employment, it falls on the employer, if he disputes the claim, to prove that the contrary was the case." The author adds that even "where an employee is found dead at his post of labor, without direct evidence as to the cause," which evidence we have in the present case, "an inference may arise of an accident while the employee was engaged in his employment," such inference being of course, subject to rebuttal by the defendant. Our own cases are strongly to the same effect. See *Tenn. Chemical Co.* v. *Smith,* 145 Tenn., 533, and *Tenn. Eastman Co.* v. *Russell,* 150 Tenn., 331.

We apprehend that confusion of this distinction touching the burden of proof is largely responsible for the

conclusion of the learned Chancellor that the claimant had failed to make out her case. We do not overlook the general rule that the burden of proof to establish the affirmative of an issue rests in a general sense upon the party alleging the facts constituting that issue, and remains there until the end. But it is also true that the burden of proof, in the sense of the duty of producing evidence, passes from party to party as the case progresses. A clear and full discussion of this question is contained in the opinion of Mr. Justice NEIL, in *North Memphis Sav. Bank* v. *Union Bridge & Const. Co.*, 138 Tenn., 161, 184, et seq.

*(2)* The question here then is, has the defendant produced evidence from which a reasonable inference may be drawn that the deceased at the time of his injuries had departed from the scope of his employment, so as to take him from under the operation of the Compensation Act? This rebuttal evidence, stated briefly, consists of the finding on the railroad track, the morning following the accident, at or near the probable place of its occurrence, of (1) the cap, lantern and mutilated toes of the deceased, and (2), some feet away, a watermelon; and testimony that the three cars ahead of the poultry car on this train carried melons, one of these cars having been found, on its arrival at Washington the next day, to be in bad condition, in that the side doors bulged out and an end door was broken loose. It appears that statements made by the deceased as to the manner of his injuries were excluded by the trial court on objections and are not before us.

Just here it may be well to re-state condensedly the nature of the employment of Shockley and refer to certain applicable principles of construction. The employee

was engaged to make a trip of days on a freight train from Morristown, Tennessee, to New York City, with the special duty of caring for a certain carload of poultry, on which car it was his duty to ride. This was one of many such trips made in the line of his general employment. No orders are shown requiring that he ride in or on this particular car without interruption or departure therefrom, and we see no reason to assume that it was not within the contemplation of the parties that he might from time to time as necessity or reasonable occasion might require, at least temporarily alight therefrom. Indeed, it is affirmatively shown that it was common, if not customary, for those similarly engaged to dismount from their cars, when the train was standing, for fresh air, exercise, fresh water and perhaps other reasons. Also, to climb outside ladders to the top of the cars as occasion demanded to regulate ventilation, or assist in filling the water tanks. It would seem that in the circumstances of his employment, covering a long and tedious trip, he would be justified in leaving his car temporarily for either of numerous purposes, and would, while outside of his car and in reasonable proximity thereto, continue to be within the contemplated scope of his employment. Responses to calls of nature, demands for fresh air (the atmosphere of a car so loaded is naturally offensive in August weather), or for food, or water, or physical exercise, if answered by leaving the immediate car temporarily for the ground, or adjacent cars, would not involve an abandonment, or such a departure from his employer's business as would take him from the protection of the Act.

*Patten Hotel Co.* v. *Milner*, 145 Tenn., 632, is authority for a departure from a fixed place of work in a case of necessity for fresh air. And, reviewing the pertinent

authorities, Mr. Justice McKinney, in *Tenn. Chemical Co.* v. *Smith, supra,* says, "It is none the less an injury by accident arising out of and in the course of employment, though it occurred to the employee while not actually engaged in the work of the master;" and he quotes with approval the following: "An employee while at work for his employer may do those things which are necessary to his own health and comfort, even though they are personal to himself, and such acts will be considered incidental to his employment." And while recognizing, as do we, the general rule that an employee cannot be awarded compensation when he has turned aside from his employment for his own purposes, many illustrations are given in Corpus Juris (Workmen's Comp. Act Adv. sheets, paragraph 78), of departures by an employee which do not deprive him of compensation, for examples, "in seeking toilet facilities, in preparing for the street, in quenching his thirst, in heating a lunch, in seeking fresh air, in seeking shelter from a storm, in protecting himself from cold, or even in saving his personal belongings from injury."

The following statement of this rule is from *Bryant* v. *Fissell,* 84 N. J. L., 72, 86 Atl., 458, and is quoted with approval by the Annotator in 1916A, L. R. A., page 232; "An accident arises 'in the course of the employment' if it occurs while the employee is doing what a man so employed may reasonably do in the time during which he is reasonably employed and at a place where he may reasonably be during that time; and it arises 'out of' the employment when it is something the risk of which may have been contemplated by a reasonable person when entering the employment incidental thereto." And see note on page 320, L. R. A., 1916A, giving many illustrations of

the rule that temporary departures for purposes of refreshment do not operate to disentitle the employee to compensation.

So that we hold that evidence, afforded by the circumstance of the finding of the deceased's cap and lantern and mutilated toes on the railroad track, that he had gotten out of his car when injured, fails of itself to establish a departure from his employment in the sense of the act. Indeed, conceding that the finding of his cap and lantern and toes or foot on the track indicates that he was outside of his car when injured, it does so no more than does his physical condition when found.

(3) We have indicated our conclusion and reasons therefor, that his having dismounted from the car and being outside of it when injured, is not proof of a material departure from his line of employment.

(4) We come now to consider the probative force of the specific evidence relied on to establish the defendant's theory of a material departure from employment for a purely personal purpose. This consists alone, as we find it, of the discovery the following morning of a watermelon between the tracks near the apparent location of the accident. Coupled with the fact that three cars just ahead of the poultry car in charge of the deceased were loaded with melons, and that doors of one of these cars were found, when the train reached Washington, to be in a damaged condition. Whether the melon on the tracks was of the same kind, variety, or appearance as those in the cars is not shown. Nor whether the condition of the doors was such as to permit melons to roll or fall out, nor whether in fact any of the load had escaped or been removed in transit. Whether or not, if this melon came from one of these cars, it was thrown off

by the jerking of the train as it was started up at the place of the accident, is a matter of conjecture only. The theory of the defendant is that the deceased had left his car while the train stood at Montview and gone forward and purloined a melon, and was injured in an attempt to reboard the train while moving, encumbered with the melon, which he dropped as the accident occurred.

The proof is that the train stood for "not.more than eight minutes" altogether, according to the conductor. As further indicating the time it stood, the conductor and a trainman say that when it stopped they left the caboose in the rear end and started forward, that when they reached the poultry car they saw the deceased sitting therein and they there had a conversation with him, which they detail, and, then, leaving him in that position, walked on some dozen or more car lengths, and receiving at this point notice that "the hot box was O. K. to go to Monroe" started back to the caboose. Meanwhile, the train moved off and they swung it while in motion. It thus appears that the interval of time between their conversation with the deceased and the starting of the train was exceedingly brief. Was it sufficient for the deceased to have left his seat in his car, followed the conductor up the track to the watermelon car, and extracted from it this melon and prepared to reboard the train with it before or as the train moved?

This theory must also assume felonious conduct on the part of the deceased. Whether or not in this proceeding the claimant is entitled to that presumption of innocence of such criminal conduct, which the law would assure to the deceased in a prosecution for the offense, we should at least hesitate to adopt this theory until supported by more than inference. Crime should not be

lightly imputed. It is axiomatic in civil proceedings that a man will not be presumed to have intended to commit a fraud—much less a crime. *Malum non praesumitur* (evil is not presumed) is an ancient maxim. And 22 C. J., page 144, cites numerous authorities for the rule announced in the text that the presumption in favor of innocence of crime is given application in civil as well as in criminal proceedings.

*(5)* In a civil action, as between honesty and fidelity and the contrary, the law presumes the former. *White v. Bates,* 234 Ill., 276; *Hendricks v. Calloway,* 211 Mo. 536. "Where, in the trial of a civil cause, a person is charged with . . . crime, there is a legal presumption that he is innocent, and he is entitled to have such presumption considered by the jury in connection with the evidence in the case." *Childs v. Merrill,* 66 Vt., 302, 308. However, the weight of authority is against the application to civil suits of the "beyond a reasonable doubt" rule recognized in criminal prosecutions. The presumption may be overcome by a preponderance of the evidence. 10 R. C. L., page 1014.

If this melon came out of these cars, is it not as reasonable to assume that it was jerked, or thrown, or fell out through the broken door, as that it fell from the arms of the deceased? This is but one of the many inferences equally plausible in explanation of the fall of the deceased beneath the moving wheels of the train. For example, one witness, a poultry car caretaker, testifies that he had himself been thrown out of the door of his car by the jerk of a starting train; that it was common to climb out of his car and up the ladder on the side to the roof of the car to adjust the ventilators; that the custom was always to do this when rain fell or was

threatened; that it was common for such employees to get out of the cars when the train was standing to get fresh air, or fresh water, or ice from refrigerator cars on the train, and that there were no rules or instructions against such practices. It appears from what has been said that the evidence relied on for the defendant to meet the *prima-facie* case for an award, by establishing that the deceased was on this particular personal mission, rests on inferences, (1) that the melon found came from the cars ahead, (2) that it was brought out by the deceased rather than fell or was thrown out, and (3) that his fall beneath the car wheels was the result of his attempt to board the train with the melon in his arms.

From 10 R. C. L., 870, we quote as follows: "It is a well-established rule that a presumption can be legally indulged only when the facts from which the presumption arises are proved by direct evidence, and that one presumption cannot be deduced from another. To hold that a fact inferred or presumed at once becomes an established fact, for the purpose of serving as a base or a further inference or presumption, would be to spin out the chain of presumption into the regions of the barest conjecture." And see *Railroad* v. *Lindamood*, 111 Tenn., 457.

Our conclusion is that the evidence relied on to establish the rebuttal fact that the deceased had departed from his employment to steal a watermelon, and that it was out of this departure that the accident arose, is not sufficient.

It results that the judgment must be reversed and, unless counsel agree upon the amount of the award, the cause will be remanded for a decree awarding compensation in such amount as the Chancellor may compute.