# QUAKER OATS CO. et al. v. DAVIS.—
## 232 S. W. (2d) 282.

Western Section. Nov. 15, 1949.

Petition for Certiorari denied by Supreme Court, February 10, 1950.

John R. Gilliland, of Memphis, S. Homer Tatum, of Alamo, Lloyd Tatum, of Jackson, for plaintiff in error.

J. B. Avery, Sr., and J. B. Avery, Jr., both of Alamo, for defendants in error.

ANDERSON, P. J. Mrs. Ester King Davis was in the business of raising chickens for the market. She bought from a local dealer, the defendant, Craig Laman, some chicken feed manufactured by the defendant Quaker Oats Company. She fed the product to her young chickens and claims that as a result, many of them sickened and died; and that the chicken house

became contaminated, forcing her to suspend the business for a considerable period. She brought this suit against the local dealer, Laman, and the manufacturer, Quaker Oats Company, to recover damages, alleging negligence on the part of the manufacturer in mislabeling the chicken feed. At the conclusion of all the evidence, a motion on behalf of the defendant Craig Laman for a directed verdict was sustained and the suit as to him dismissed. A similar motion by the defendant Quaker Oats Company was overruled and the case as to that defendant submitted to a jury who returned a verdict in favor of the plaintiff, assessing the damages at $2,000.00. The trial judge concurred in the jury verdict and entered a judgment accordingly. The defendant Quaker Oats Company appealed in error. The plaintiff prayed no appeal from the action of the court in directing the verdict in favor of the defendant Craig Laman, and we are not concerned with the case as to him.

The first submission is that the motion of the Quaker Oats Company for a directed verdict should have been sustained because there was no material evidence to support a verdict against it.

The declaration alleged in substance that the defendant Craig Laman was engaged in the mercantile business in Alamo, Tennessee; that the defendant Quaker Oats Company was a foreign corporation domesticated in Tennessee and engaged in the manufacture of animal and poultry feed, with a plant at Memphis; that the defendant Craig Laman handled and sold at retail the poultry feed manufactured by his codefendant; that on or about July 5, 1947, and prior and subsequent thereto, the plaintiff was engaged in the business of raising chickens to the size of broilers and fryers for the mar-

ket; that she started her baby chicks with the Starter Mash, and as they advanced in age she fed them a preparation known as Full-O-Pep Broiler Mash, manufactured by the Quaker Oats Company and purchased by her at retail from the defendant Craig Laman; that said preparation was regularly labeled as required by Code Sections 499.1-499.16, inclusive, requiring among other things the name, brand or trade-mark under which the article was sold, and the name and principal address of the manufacturer or person responsible for placing the commodity on the market; that on or about July 5, 1947, she ordered from the said Craig Laman two bags of said Full-O-Pep Broiler Mash; that pursuant to said order the said Craig Laman delivered to her two bags of said preparation, which were branded and tagged, "Full-O-Pep Broiler Mash"; that on said date, July 5, 1947, she fed the contents of one sack to her chickens and fed them the contents of the other on the following day, believing it to be said Full-O-Pep Broiler Mash as represented by the tags attached to said bags; that instead of containing said Full-O-Pep Broiler Mash, said bags in fact contained another food known as "Quaker Sugared Schumacher Feed", which was a feed made for hogs and cows and not fit for chickens; that being unaware of this fact and believing the two bags contained the chicken feed known as Full-O-Pep Broiler Mash as represented by the tags thereon, she fed the contents to her chickens with the result that many of them became sick within 24 hours thereafter and some 1150 or more died.

The sole act of negligence charged is the alleged mislabeling of the contents of the two sacks of feed.

In support of its submission that a verdict should have been directed in its behalf, the defendant assigns the

following reasons: (1) that by the undisputed evidence the feed in question was purchased from an intermediate dealer, and as it was not food for human consumption or inherently dangerous, there was no liability on the part of the defendant manufacturer for want of privity between the parties, it not being shown that the manufacturer had actual knowledge that the two sacks of feed were mislabeled; that (2) there is no evidence to warrant the conclusion that the two sacks were in fact misbranded by the defendant in that they contained Sugared Schumacher Feed instead of Full-O-Pep Broiler Mash; (3) that the undisputed evidence shows that if the two sacks of feed had been misbranded and in fact contained the Sugared Schumacher Feed, "still the feeding of it to the plaintiff's chickens could not possibly have produced the sickness and death among her chickens, as the Schumacher Feed was in fact a good feed for chickens".

■ In support of its defense based upon want of privity between the parties, the defendant cites Burkett v. Studebaker Bros. Mfg. Co., 126 Tenn. 467, 150 S. W. 421; Liggett & Myers Tobacco Co. v. Cannon, 132 Tenn. 419, 178 S. W. 1009, L. R. A. 1916 A, 940, Ann. Cas. 1917 A, 179; St. Louis Fireworks Co. v. Wilson, 5 Tenn. Civ. A. 388; Smith v. Durant Motor Car Co., 1 Tenn. App. 290.

It is not necessary, even if it were appropriate, for us to enter upon a discussion of the trend of decision away from the rule of these cases as reflected by decisions elsewhere. The subject is fully treated in the annotation appearing in 164 A. L. R. 570 et seq. See also, the American Law Institute's Re-Statement of the Law of Torts, vol. 2, Sections 388, 394-398. It is sufficient to say that the rule laid down in this jurisdiction in the cases

cited by the defendant has, we think, no application by reason of the following facts: The defendant company had in its employ a salesman by the name of Smith. It was part of his duty to induce those engaged in raising poultry for the market to use the products manufactured by the defendant. It was also Smith's duty as well as that of another employee by the name of Seigerson to "make visits to people engaged in the poultry business and advise with them about the chickens and their difficulties, if any".

When the defendant company learned that the plaintiff was about to engage in the business of raising chickens for the market, it sent its representative Smith to her to solicit her feed business. As a consequence Smith in cooperation with the local dealer Laman prevailed upon the plaintiff to adopt a feeding program calling exclusively for the use of the defendant's products, including the Full-O-Pep Broiler Mash, to be purchased through the local dealer as and when needed. Moreover, Smith thereafter upon occasions advised with the plaintiff as to the feeding and care of her chickens.

In these circumstances, we think the rule based on want of privity is inapplicable. Burkett v. Studebaker Bros. Mfg. Co., supra, 126 467, 472 et seq., 150 S. W. 421.

 Contrary to the defendant's contention, there was substantial evidence that the two sacks of feed were misbranded or mislabeled.

The chickens were fed twice a day, morning and evening. The plaintiff returned from a trip out of town on the afternoon of July 5, 1947, and learned from her helper Fewell who was then engaged in the afternoon feeding, that he did not have enough feed to complete

the task. She thereupon ordered by phone from the defendant Laman some additional feed, including some Starter Mash and two sacks of the Full-O-Pep Broiler Mash manufactured by the defendant. The feed was promptly delivered and when one of the sacks of the Broiler Mash was opened the plaintiff and her helper and her brother King who was also present, observed that the contents were of a different color from the Full-O-Pep Broiler Mash which they had been using before. This caused some discussion among the three as to whether it was the same feed they had been using before and to be certain they examined the tag affixed to the bag and discovered that it designated the contents of the sack as being Full-O-Pep Broiler Mash and also bore on its face the same analysis of the feed as had been on the tags affixed to all of the bags of that particular feed theretofore purchased. Being thus re-assured they fed some 25 or 30 pounds of that feed to the largest chickens, which were in a pen located in the southwest corner of the building. This completed the afternoon feeding of the entire flock. On the following day, which was Sunday, they fed to the older chickens the remainder of the contents of the first bag and the contents of the second, which were of the same color as that of the first. There was apparently a small quantity left which was fed on Monday morning, but plaintiff was not certain as to this. The second bag also bore the same kind of tag designating the contents as Full-O-Pep Broiler Mash with the same analysis.

When, on Monday morning following the feeding of the controversial feed on the two preceding days, the plaintiff discovered that a large number of her chickens were sick, she called the defendant Laman and requested

him to get in touch with the Quaker Oats representative Smith, who, she thought, "might be able to tell me what was wrong with my chickens". This Laman did, and he and Smith visited the plaintiff's place of business on Tuesday. Plaintiff told Smith about the situation and Laman, upon inquiring about the feed, was told by the plaintiff that, "I don't know of anything (wrong) except that on Saturday and Sunday . . . the feed I fed was a little bit off color". Thereupon Laman, in the presence of Smith, stated, "Well, I think I know what is wrong with your chickens"; that she "had fed them hog feed, he said, and he told me that he had . . . 5 bags of Schumacher Feed for James Nance and two of them were labeled Broiler Mash and he had sent them up to me"; that this feed had been sent to him from the Quaker Oats Company from the plant of the Quaker Oats Company at Memphis where he got his feed. An objection to this testimony as against the defendant Quaker Oats Company was sustained. In the circumstances the evidence was probably competent, but we need not determine that question or consider the evidence.

The first thing Smith said after hearing Laman's remarks was, "Let me see those bags", referring to the then empty bags in which the feed in question had come, and upon being shown them and examining a small quantity of the feed which was clinging to the sides of the sacks, he said, "It looks like Sugared Schumacher feed to me". Plaintiff asked him what he could do about the loss of her chickens, and Smith said, "There wasn't a thing he could do about it". Thereupon the plaintiff asked him to give her the name of an official of the Quaker Oats Company in Memphis with whom she could talk about the matter.

Both kinds of feed were put up in bags weighing 100 pounds each. They were made of the same kind and color of print cloth. The bags of Full-O-Pep Broiler Mash purchased by the plaintiff prior to the receipt of the two in question, contained a label in size about 8 x 10 inches pasted or otherwise fastened on the outside of the sack, on which there was a picture of two fighting cocks. There was no such label on the two bags delivered to the plaintiff on July 5th.

Following the above-described visit of the defendant's representative Smith, the plaintiff twice interviewed a Mr. Childs, who appears to have been the manager of the defendant's Memphis plant. On her first trip she carried with her the two empty bags in which the controversial feed had been delivered to her, and told him what had happened. He asked for one of the bags and when plaintiff gave it to him, "the first thing he did was to take a ruler out of his desk and measure the bag and then he called someone on the telephone and got the dimensions of a Sugared Schumacher bag and it was of the same size of the bag he had". Plaintiff left one of the bags with Childs and kept one. At Childs' request she returned to Memphis some seven or eight days later. In the conference which followed there was present another representative or official of the defendant company and both he and Childs told the plaintiff that the Sugared Schumacher feed did not kill the chickens; that in fact it was recommended as chicken feed and was being used in some areas, particularly in Georgia. The plaintiff testified that throughout this conference it was assumed by all those present that the contents of the two bags in question had in fact been Sugared Schumacher Feed instead of Full-O-Pep Broiler Mash. How-

ever, she admits that in response to her contention that the defendant company was liable for her loss, Mr. Childs made the inquiry, "How are you going to prove it is (was) Sugared Schumacher Feed?"

Childs, testifying as a witness for the defendant, recalled the plaintiff's two visits and said that when he examined the empty sacks she had with her, there was not enough of the feed left in them with which to have a chemical analysis made; that he was not personally familiar with the size of the bags in which the defendant's various products were shipped, but while the plaintiff was present he inquired of the various departments and from what he learned the two bags might have contained either kind of feed so far as the size was concerned.

We think the foregoing evidence was sufficient to justify the jury in finding that the two bags in question in fact contained Sugared Schumacher Feed, whereas the tags thereon represented that they contained Full-O-Pep Broiler Mash.

There is no direct evidence as to who was responsible for mislabeling the two sacks. The plaintiff's case rests exclusively on circumstantial evidence as is almost always true with the line of cases dealing with the liability of the manufacturer or vendor of food or beverages. The evidence bearing on the responsibility of the defendant company tended to establish the following facts:

All of the poultry feed sold by the local dealer Laman to the plaintiff was received by the former from the Quaker Oats Company, and delivered to plaintiff in the original package. At and prior to the time here in question the tag made of card board which was affixed

to each bag containing Full-O-Pep Broiler Mash and Sugared Schumacher Feed was fastened in the cloth by means of a small piece of wire, one end of which was looped through the end of the tag and the other through the cloth of which the bag was made. The two ends of the wire were not twisted together, or otherwise fastened. It seems that after its experience in this case the defendant company sewed the tags on the bags, thus making them more securely fastened, and there is considerable said in the plaintiff's brief about this fact. We do not quite understand the significance to be attached to this charge. The case for liability does not proceed upon the theory that the tags were negligently attached to the bags, and if it did, the fact that the defendant subsequently improved its method in this respect could not be considered as evidence of negligence. Illinois Cent. R. R. Co. v. Wyatt, 104 Tenn. 432, 58 S. W. 308, 78 Am. St. Rep. 926; Wigmore on Evidence, (2d) Ed., Vol. 1, Sec. 283; Sherman & Redfield on Negligence, Vol. 1, Sec. 60.

In addition to the analysis and weight of the contents, each of the two tags affixed to the bags in controversy contained the brand name, to wit, Full-O-Pep Broiler Mash, and a statement to the effect, "Made by the Quaker Oats Company, Address, Chicago, Ill.". On the back of each tag was a paper stamp apparently glued to the tag, bearing the following inscription:

"Tennessee Inspection Tax, 100 pounds feed stuff. This stamp must be attached to the guaranteed analysis.

Comm. of Agriculture<br>
One Cent"

The inscription is followed by a signature in script which is not readable.

At the same time that defendant Laman was selling poultry feed to the plaintiff, he was selling to a Mr. Nance in the same community, the Sugared Schumacher Feed which the latter fed to his hogs. On June 20, 1947, Laman received a shipment of 60 bags of Broiler Mash from his codefendant Quaker Oats Company. This was the last shipment of that kind of feed received by him before the delivery to the plaintiff of the two controversial bags on July 5th. On July 1, 1947, Laman received five bags of the Schumacher Feed, which he was selling to Nance. He delivered these five bags to the latter on July 8th. Laman testified that the two controversial bags were contained in the shipment of 60 bags received by him on June 20th and that they had been in his storeroom from that time until they were delivered to the plaintiff on July 5th. He also testified that his customers had access to his storeroom and went in and out at will; that he himself did not tamper with the tags on any of the bags but that it was possible for some one else to have "switched them" without his knowing it.

He was referring to the possibility that the tags from two of the bags of Schumacher Feed intended for Nance were transferred to two of the bags of the Broiler Mash and the tags on the latter transferred to the two bags of the former.

Mr. Nance was examined as a witness for the plaintiff. He is, among other things, a raiser of hogs for the market and as feed for them uses the defendant company's Sugared Schumacher Feed on a large scale, feeding about 300 bags a year. He testified generally that he had never fed his hogs any Full-O-P'ep Broiler

Mash, but he was not asked about the five bags delivered to him on July 8, 1947, and did not undertake to say whether two of them had attached tags indicating that the contents were Full-O-Pep·Broiler Mash.

However in the absence of any evidence to the contrary, it must be presumed that the bags were properly labeled as required by statute. Code Sections 499.1-499.16. Childs, the manager of the defendant's Memphis plant, testified that after the feed is mixed in the plant it is sacked, then tagged and sent to the shipping floor "where it is either shipped out in cars or is put on the floor to handle later or sent out in railroad cars or trucks." He also testified that at a time prior to the time in question the tag was sewed on the top of the bag. It is not clear whether this was an additional tag and there is a conflict in the evidence as to whether this system of affixing the tags was in effect at the time in question or was adopted later. This however we regard as immaterial.

Childs further testified that he had no personal knowledge of how the tags were affixed or whether the particular shipment to the local dealer Laman contained any bags that were mislabeled or misbranded. With respect to the alleged mislabeling of the two bags in controversy, he testified: "I don't know what might have been done; I am not in a position to say."

In support of its contention, the defendant relies upon the case of Coca-Cola Bottling Works v. Sullivan, 178 Tenn. 405, 158 S. W. (2d) 721, reported as a leading case and annotated in A. L. R., Vol. 171, at page 1,200. That was a suit against the Bottling Company for an injury suffered by one who drank a soft drink containing glass, the beverage having been purchased from an

intermediate vendor. A directed verdict for the defendant was held proper. The ground of the decision was that a presumption of negligence on the part of the bottler of soft drinks, calling for a submission of the case to the jury, does not arise in favor of the consumer who was injured by swallowing a foreign substance as he drank from a bottle of soft drink purchased at a service station where soft drinks were sold as a side line, where the proprietor of the service station, although testifying that he purchased all of the particular brand of drinks from the defendant, declined to say that the specific bottle came from the defendant and admitted opportunities for substitution or tampering with his stock, both in the cooler to which customers had frequent and unobserved access, and in the stock room where his reserve supply was kept.

The present case is distinguishable from the Sullivan case in at least three particulars: (1) here, the evidence leaves no doubt that the two bags in question came from the defendant company; (2) the opportunities for tampering with the tag were not equal to the opportunities for tampering with the bottle involved in the Sullivan case; and (3) the inherent difference in the nature of the two acts involved, namely, the putting of a false tag bearing the defendant's name on the two sacks and putting glass in a bottled beverage or the substitution of a bottle containing glass for one that did not.

■ In this case the facts that the two bags in question came from the defendant; that the defendant customarily put on each of its bags a tag identical in form; that the tag had printed thereon the name and address of the defendant and a brand of food manufactured by the defendant, together with an analysis thereof; and

the fact that the local dealer did not tamper with the tag after the two bags were received, were sufficient to show prima facie the defendant's responsibility and shift to the defendant the burden of producing evidence to the contrary. Cf. Coca Cola Bottling Works v. Kennedy, 13 Tenn. App. 199, 202; Roddy Mfg. Co. v. Cox, 7 Tenn. App. 147, 151; and cases collected in the notes in the annotations appearing in 4 A. L. R. 1559, 47 A. L. R. 148, 105 A. L. R. 1039, 171 A. L. R. 1209.

■ But the defendant contends that the probative force of these circumstances is destroyed by the mere fact that after the bags left the hands of the defendant company they remained for a few days in the local dealer's storeroom and that the latter's customers went in and out of that room at will. The argument necessarily is that from these facts it was permissible to infer it to be as probable that some one took off the proper tag which was on the bag when it left the defendant's hands and substituted another one as it was that the wrong tag was put on the bag by the defendant. We do not think the circumstances will support any such inference. Such a conclusion is of course a theoretical possibility but it has no basis in the realities of everyday experience. To hold otherwise would be to say that after the bags left the defendant's hands some mischievious or malevolent person having no particular purpose to accomplish and no particular victim in mind, procured printed tags identical with those customarily used by the defendant, and substituted them for the proper tags which were on the bags when they left the defendant's possession. Any such conclusion is too far-fetched to have any place in the practical administration of justice. The circumstances, when tested by experience,

furnish no basis for it. Upon the contrary, any such conclusion would necessarily be the result of conjecture, a luxury no more permitted to a court than to a jury. Cf. Fischer Lime & Cement Co. v. Sorce, 4 Tenn. App. 159, 164; see also, Nashville C. & St. L. Ry. v. Harrell, 21 Tenn. App. 353, 364, 110 S. W. (2d) 1032. Moreover, to reach it would be to speculate against the circumstances shown by the undisputed evidence and pointing to a different conclusion, and one which, when tested by experience, is more reasonable.

■ Assuming that the evidence was sufficient to justify the conclusion that the two bags were in fact mislabeled and that the defendant was responsible therefor, it remains to be determined whether there was evidence adequate to support a conclusion that there was the requisite causal connection between the mislabeling of the feed and the injury to the plaintiff's chickens, for as in every case of negligence, the burden was upon the plaintiff to show the injury, the act which produced it and the defendant's negligence, and, further, the nexus between them in the relationship of cause and effect. De Glopper v. Nashville Railway & Light Co., 123 Tenn. 633, 643, 134 S. W. 609, 33 L. R. A., N. S., 913.

The rule adopted by the American Law Institute is that the actor's negligent conduct is the legal cause of harm to another if it is a substantial factor in bringing about the harm, and there is no rule of law relieving the actor of liability. Re-Statement of the Law of Torts, Vol. 2, Sec. 431, page 1159. In commenting upon this rule, it is said: "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the pop-

ular sense in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense', which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called 'philosophic sense', yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.'' Ibid, page 1160.

The rule defining the respective functions of the court and jury in determining whether there exists between the defendant's negligence and the injury the requisite causal connection, is stated by the same authority as follows: ''It is the duty of the court to determine whether, upon the facts which are admitted, found by special verdict or reasonably inferable from the evidence, the actor's conduct is a substantial factor in bringing about harm to another, unless the question is open to a reasonable difference of opinion, in which case it is to be left to the jury.'' Re-Statement of the Law of Torts, Section 431, page 1171.

It is needless to cite the cases to show that this statement is in full accord with the decisions in this jurisdiction.

When the plaintiff entered upon the business of raising chickens she built a chicken house costing about $6,000.00. The building was 30 x 60 feet with outside walls of concrete blocks. It had a concrete floor with drains running lengthwise. It was divided into eight pens four on each side of an aisle-way in the middle. The pens were all 13 feet in depth but were otherwise graduated in size so as to allow for the growth of the chickens which were transferred from pen to pen as they grew older. Each pen had a mesh wire bottom which

was about 30 inches above the concrete floor. The chickens in the pens on each side of the aisle had a common watering trough. In other words, there was one trough on each side which carried the water to all the chickens in the four pens on that side.

In the gable at one end of the house there was a large ventilating fan which apparently ran continuously. Prior to the particular occasion here in question, the plaintiff after cleaning out the droppings from the pens, would wash the concrete floors, using a hose.

So far as appears, plaintiff had no previous experience in raising chickens on a commercial basis. She embarked on her venture about six weeks before July 5, 1947. On that date she had in the house some 4000 chickens, ranging in age from one day to nine weeks, which had been originally purchased from the firm of Dodd & Sellars, of Lexington, Tennessee. As had been recommended by defendant's representative, Smith, the younger chickens were then being fed the Starter Mash manufactured by the Quaker Oats Company, and the older ones the Full-O-Pep Broiler Mash. All of the feed used by the plaintiff, including the Starter Mash and the Broiler Mash, had been purchased from the defendant, Laman.

The chickens which had advanced far enough in age to be fed the Broiler Mash were contained in five of the eight pens, the remaining three containing the smaller chickens. As indicated, at the Saturday afternoon feeding only the chickens in one of these five pens had been fed from the contents of the bags in question. At the two feedings on Sunday, the fowls in all five of the pens were fed out of the two bags and as said, there was possibly a small quantity left over, which was fed on

Monday morning, thus exhausting the feed contained in those particular bags.

At the Monday morning feeding, the chickens in the one pen which had been fed on Saturday afternoon from one of the two sacks in question, evidenced strong symptoms of being ill and some fifteen of them were dead. Plaintiff testified that, ''Their feathers were turned in and they had what I would call the croup.'' The chickens which had received no feed out of those particular bags on Saturday were apparently in the same good condition in which they had been theretofore. At least, they evidenced no symptoms of illness at that time. On Tuesday morning, however, all of the chickens which had been fed from the two bags manifested symptoms of illness, whereas all of the smaller chickens which had been fed on the Starter Mash were still healthy and thriving.

As a result of the illness among her chickens, the plaintiff cancelled all outstanding orders for chickens until she could get those on hand ''out of the house''. When this was done, she cleaned out the premises, sprayed them and in August got a new supply of chickens from the breeder. These were healthy when put in the house but within three or four days thereafter ''started drooping and dying''. The result was, she was obliged to again cancel her outstanding orders for additional chickens and got no more until November, 1947. She continued her efforts until March, 1948, when she ceased altogether putting chickens in the house. She did not resume business until May 1, 1948. Between July 5, 1947, and March, 1948, when she temporarily suspended the business, the plaintiff testified at one place that she handled a little over 10,000 chickens in her establishment. At another place, she testified that during the

same period she bought and put in the house approximately 6,000 and of these marketed 3,300. However, in the view we have of the case the discrepancy is not material in a determinative sense.

Prior to July 5, 1947, the mortality rate among the chickens, the plaintiff said, had been but 2% to 3% during the six weeks she had been in business. The only chickens manifesting symptoms of illness on the particular Monday morning were those in the one pen which had been fed the controversial feed on the preceding Saturday afternoon or evening. These were at that time nine weeks old and were the oldest of the entire flock. Plaintiff had had them about six weeks during which time she had been feeding them Full-O-Pep Broiler Mash. There were originally 553 of them and prior to July 5, 1947, she had lost only 3, one or two of which were killed by accident. On Tuesday morning, all of the chickens which on Saturday and Sunday had been fed from the controversial sacks were manifesting symptoms of illness. The younger chickens which had been fed the Starter Mash were at that time "still healthy and thriving". It was five days thereafter before the disease appeared among them. How many of the group died, if any, is not clear.

When, in response to the plaintiff's request, the defendant's representative Smith on July 8th paid his above-described visit to her poultry establishment, he examined the sick chickens and told the plaintiff they were suffering from "colds and pneumonia and coccidiosis."

A day or two later Smith returned with a Mr. Seigerson, another representative of the Quaker Oats Company who was an expert in the care of chickens and their

diseases. He examined the plaintiff's flock and found that the chickens from four to seven weeks had coccidiosis and those younger had colds. His investigation which resulted in the diagnosis included cutting open two of the older chickens and an examination of the intestines.

Coccidiosis is a germ disease which attacks chickens from 3 to 6 weeks old. It requires 36 hours for the germ to develop after the first symptoms appear. Baby chicks are more susceptible to colds and pneumonia than are those several weeks old, but this is not the case with coccidiosis. Pneumonia is also a germ disease and its victims are usually the smallest chickens.

Seigerman's opinion was that the illness of the chickens was due to the draft blowing over the wet concrete floor from the ventilating fan with the result that the air flowed over and under the pens in which the chickens were confined.

On or about July 10th or 11th, Mr. Sellars of the firm of Dodd & Sellars, of Lexington, Tennessee, from whom the plaintiff originally purchased her chicks, visited the plaintiff's place of business pursuant to her request, and examined her chickens. He likewise informed her that the chickens were suffering from pneumonia and coccidiosis. He suggested that she send a number of them to a laboratory for examination. To this the plaintiff agreed, and Sellars killed and sent the bodies of eleven chickens to Salsbury's Laboratory, at Charles City, Iowa, with the request that a chemical analysis be made and a report given as to what was causing the fatalities. The laboratory made the necessary examination and sent a written report to Mr. Sellars who turned it over to the plaintiff. Evidence of the fact that such examination and report had been made was admitted by the court,

but upon the plaintiff's objection, the report itself was excluded.

Error is assigned on this action of the court. At the time of the trial the report was in the possession of the plaintiff's attorney and was produced at the request of the defendant. It is as follows:

"A Nation-Wide Poultry Service Dr. Salsbury's

Dr. J. E. Salsbury President

Dr. John G. Salsbury Vice-President and General Manager

Laboratories

54277 to 82 inc.

Charles City, Iowa, U. S. A.
July 17, 1947

"Dodds & Sellers
"Lexington
"Tennessee

"Gentlemen:

We received a shipment from you containing six dead Red chicks, that we judged to be about two weeks old, as well as five larger specimens, which we judged to be four to six weeks old. We wired you today that the young chicks had pneumonia very bad and the older ones, coccidiosis, air sac infection, and rickets. According to your letter, you have 4000 chicks, ranging in ages from one to eight weeks. All ages of chicks seem to be affected and have been affected for at least one week. According to your letter, it seems like the building and all equipment is entirely new, and it certainly seems strange that you should encounter so much trouble with that kind of a layout.

"We cannot believe that anything else is to blame than that there must be something about the way you are brooding and caring for these birds that is responsible for your bad mortality being experienced at the present time. We regret very much that our representative, Mr. William Myers, who is recovering from an operation, will not be able to call and investigate your trouble.

"The older birds had quite a lot of coccidia parasites, and from one of the older birds, we recovered some paratyphoid germs on culture. But, a great amount of air sac infection, pneumonia, and malnutrition conditions, causing the chicks to be unable to assimilate the proper amount of minerals, from our findings, seems to be the undermining causes for mortality. I am going to advise that you check up carefully on the possibility of improper ventilation or drafty condition in your brooding room and other brooding irregularitities (sic) may also be contributing to the trouble. I hope that a careful check up may reveal why you are losing so many birds each day.

"About the best thing we can think of, under the circumstances, is to put these birds on treatment as recommended in the ten steps helpful for coccidiosis control which you will find enclosed. Also, be sure to spray these chicks liberally several times daily with a warm Can-Pho-Sal solution as an inhalent spray as long as there is evidence of respiratory infection.

"Yours very truly,

"Dr. Salsbury's Laboratories
by P. C. Molgard, DVM
by P. C. Molgard, DVM

"PCM :jw

"enc

Manager Diagnostic
Division

"Administrative Building

"Charles City, Iowa

Branches : Columbus, Ohio, Ft. Worth, Texas, North Kansas City, Missouri."

The evidence leaves no doubt that in procuring the laboratory report to be made Sellars was acting for the plaintiff. In fact, she herself says as much. This being so, the evidence was competent as being in the nature of an admission by a representative acting within the scope of his authority. 31 C. J. S., Evidence, Section 352, page 1127; 20 Am. Jur. 498, 499, Sec. 590. However, the erroneous exclusion of this report would not constitute reversible error for the reason among others that Sellars testified without objection that the report confirmed the opinion which he had given to the plaintiff with respect to the nature of the ailment from which her fowls were suffering, and for all practical purposes this appears to have been true.

The defendant introduced other expert evidence to the effect that the immediate cause of the illness and death among the chickens was the above-mentioned diseases, coccidiosis in the case of the chickens from 3 to 6 weeks old, and croup and pneumonia in those younger, and there is no escape from the conclusion to be drawn from the undisputed evidence that this was the case.

Although no chemical analysis of the contents of the two particular bags was made or attempted by either the plaintiff or the defendant for the assigned reason that there was not a sufficient quantity left in the bags for that purpose, if it be assumed that the contents of the two bags were in fact Sugared Schumacher Feed instead of Full-O-Pep Broiler Mash, the undisputed evidence shows that the former was not inherently unfit for or harmful to chickens. Upon the contrary, while primarily a feed for live stock, undisputed and convincing evidence offered by the defendant shows that Sugared Schumacher Feed was advertised in defendant's literature and recommended as a feed for poultry as well as for animals and that it is in fact fed to chickens by some poultry raisers. The basic difference between the two feeds is that the Broiler Mash "carried grain material, alfalfa and grass, and fish meal and certain basic vitamins.", as well as molasses; whereas the latter is essentially "grain feed carrying various proteins, including middlings, some carbohydrates", and molasses. There is also a difference in the salt content, the Schumacher Feed containing 1% salt and the Full-O-Pep Broiler Mash containing one-half of 1%. By the same evidence it appears that "because it is the high protein feed the Full-O-Pep Broiler Mash is the more complete feed for poultry", but that by actual tests of many and various kinds the Sugared Schumacher Feed contains nothing that would be injurious to chickens.

But these facts do not meet the plaintiff's contention. As developed by the evidence, her theory of liability appears to be that without regard to the inherent fitness of the particular products for chicken feed, any sudden change in the type of feed is harmful renders the chickens

more susceptible to disease and that the injury complained of was caused by the change in the feed which took place in the present case. Without reference to the particular facts of the present case, the evidence for both the plaintiff and the defendant was to the effect that any change in the feeding of chickens should be gradually made and that otherwise there is a probability that malnutrition will in time result and the resistance to disease germs will thus be lowered. The reason assigned by the witnesses who testified to this effect, and the only one as to which there is any evidence, is that if a change is made abruptly the chickens will not eat the new feed, especially if it is of a different color.

Thus in support of her theory of liability the plaintiff introduced as a witness her brother, a teacher of vocational agriculture, who said he had ''had experience, and observation with farmers and with the boys and girls he taught in the raising of poultry.'' He testified that his observation and experience had shown that ''an abrupt change is not recommended for the production of chickens''; that such change would ''throw them off feed'' and ''when they are off feed it gives opportunity for disease to creep in''. He did not express the opinion, nor did any other witness undertake to do so, that the change claimed to have been made in the present case was a substantial factor in the sickness and death of the chickens; nor did this witness or any other say that within the limited time such a change could or would have resulted in a lowering of the powers of resistance to the extent that the chickens would thereby be rendered more susceptible to the diseases with which they became afflicted.

Upon the other hand, the evidence for the defendant, consisting of the testimony of fully qualified experts, was to the effect that it was absolutely impossible for a change from Full-O-Pep Mash to Sugared Schumacher Feed to cause malnutrition in a period of 24 hours to the extent that would make the chickens more readily susceptible to the diseases here in question; that "it would not have any effect unless it were done for a lengthy period of time; if it (Sugared Schumacher Feed) were fed for a matter of a week or two weeks it might be that the lack of protein would slow down the growth of chickens, they would not grow as fast." There was no testimony to the contrary.

When she first discovered the disease among her flock, the plaintiff herself thought that there had not been time for the assumed change in the feed to have affected the chickens adversely. As already said, when she first called the defendant Laman, and the latter suggested that through mistake he might have sent her the two bags of Sugared Schumacher Feed instead of the Broiler Mash and the feeding of the former might be the cause of the trouble, the plaintiff said that "the feed had not had sufficient time in which to show any ill effect on the chickens from the feeding of it". There is no controversy about this statement having been made by the plaintiff and it is altogether consistent with all of the other direct testimony on the question.

As indicated, it would be unreasonable to conclude that there was anything in the Sugared Schumacher Feed harmful to chickens or that would in and of itself have caused the disease. The most that could be said from the evidence was that the mislabeling of the feed caused an abrupt change from the Broiler Mash to the Sugared

Schumacher Feed and that in the course of time such a change might result in a deterioration in the condition of the chickens to the extent that they would thereby be rendered more susceptible to the disease. But, as said, the only reason assigned by the witnesses who testified to the possibility of harm of any kind resulting from an abrupt change in the feed was that such a change, not having been gradually made, would cause them to stop eating for a time, and this in turn would result in a deterioration in their physical condition, rendering them more susceptible to disease. In other words, the susceptibility to disease results from the fact that due to the abrupt change the chickens will not eat. If we assume, as we do, that the evidence to this effect was true as a general proposition, the record is devoid of any evidence that the change in the present case had any such effect. Upon the contrary, from the time the two controversial bags were received on Saturady afternoon until the symptoms of the disease appeared, so far as appears, the five pens of older chickens were fed from the two sacks in controversy as long as it lasted, and so far as appears, they ate it all. In short, prior to the appearance of the disease in the flock, so far as was shown there was no diminution in the amount the chickens ate.

It follows therefore that, there being no expert testimony or other direct evidence on the question, the determinative issue of causal connection between the mislabeling of the feed and the injury to the plaintiff's chickens, is narrowed to whether the facts that it was mislabled and that the disease made its appearance within 24 to 36 hours thereafter among the group to which the feed had first been given, were circumstances from which it might be reasonably inferred that it was more probable

than otherwise that the disease was due to the change in the feed, or, more accurately, that it was a substantial factor in the contraction of the disease.

This is not a question of legal or proximate cause, as that phrase is known in the law of negligence, but one of causation in fact, which is a phase of the doctrine of "proximate cause". Being a question of fact, it reduces itself merely to the inquiry, "Has the conduct of the defendant caused the plaintiff's loss?" It presupposes that the defendant's conduct was negligent and that the plaintiff was injured. It relates solely to the nexus between the two. Circumstantial evidence or expert testimony or both may provide a basis from which the requisite connection may be inferred. Where evidence of the former kind is relied upon, whether it furnishes a reasonable basis for the necessary inference must be tested by everyday experience. "If, as a matter of ordinary experience", says Prof. Prosser, "a particular act or omission might be expected under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists." Prosser on Torts, 325.

As tested by this rule, there is no escape from the conclusion that the plaintiff failed in this vital respect. Ordinary experience furnishes no basis for a conclusion that an abrupt change to a poultry feed not inherently harmful to chickens would likely cause them to become afflicted within 24 to 36 hours with either or both of the ailments with which the undisputed evidence shows the plaintiff's chickens to have been suffering, and this is especially true where it appears that the change caused no substantial diminution in the amount of feed eaten within that period.

It is true that the plaintiff when testifying as to the nature and extent of the injury to her chickens said that the larger ones which survived the disease ''quit eating and their flesh began to waste away'', and as a result, chickens which weighed 2¼ pounds to 2½ pounds weighed only one to 1½ when sold. But it is perfectly clear from the context that she was referring to the effect the disease had upon the appetite of the chickens and not the effect of the change in the feed.

It is apparent therefore, we think, that under the facts of this case the evidence that an abrupt change in the type of feed is in general harmful in the sense above described, can be given no probative value as to the causal connection between the change which actually took place and the contraction of the disease. It will be borne in mind that no competent witness, expert or lay, expressed the opinion that the particular change in feed did or could have caused the diseases or that it was a substantial factor in causing them. Hence, to give the aforesaid testimony any effect would be to say that from the fact that an abrupt change is in general harmful because calculated to throw the chickens ''off their feed'', it was permissible to infer that the change in the present case did in fact have this effect; and from the inferred fact to further infer that malnutrition resulted; and from this to infer that within 24 to 36 hours the physical condition in the fowls deteriorated to the extent that they were rendered more susceptible to the diseases; and from this, infer that because of the suceptibility thus caused they contracted the particular ailments with which otherwise they would not have been afflicted. This type of reasoning is not valid either in law or logic. It is not permissible to rest a decision on remote infer-

ence. East Tennessee & W. N. C. R. Co. v. Lindamood, 111 Tenn. 457, 473, 78 S. W. 99; De Glopper v. Nashville Railway & Light Co., supra, 123 Tenn. at page 645, 134 S. W. 609; Shockley v. Morristown Produce & Ice Co., 158 Tenn. 148, 161, 11 S. W. (2d) 900; Gulf Refining Co. v. Frazier, 19 Tenn. App. 76, 103, 83, S. W. (2d) 285.

The present instance is not within the purview of Dean Wigmore's criticism of the general rule, that an inference cannot be drawn from another inference. Wigmore on Evidence, 3d Ed. Vol. 1, Sec. 41.

█ Hence we think a directed verdict for the defendant was required by the absence of any substantial evidence to show a causal connection between the negligent act, i. e., the mislabeling of the feed, and the injury to the fowls.

██ ██ But we think another and related rule applied to the undisputed facts required the same result. This is that where it appears with equal probability that the injuries complained of may have resulted from either of two causes, for one of which the defendant was responsible and for the other he was not responsible, any choice between them would be a matter of conjecture and hence impermissible as a basis for a recovery. Nashville Ry. & Light Co. v. Harrison, 5 Tenn. App. 22; DuPont Rayon Co. v. Roberson, 12 Tenn. App. 261; Nashville Gas & Heating Co. v. Phillips, 17 Tenn. App. 648, 69 S. W. (2d) 914; Everett v. Evans, 30 Tenn. App. 450, 207 S. W. (2d) 350. In applying this rule to the solution of the question as to whether a verdict should be directed, there must be taken into consideration the evidence on behalf of the plaintiff and such parts of the evidence introduced on behalf of the defendant as are not in conflict with the evidence for the plaintiff, disre-

garding all of the defendant's evidence that is contradicted by or inconsistent with the plaintiff's evidence. Nashville Gas & Heating Co. v. Phillips, supra, 17 Tenn. App. at page 651, 69 S. W. (2d) 914. Having this rule in mind, the evidence we think leaves no escape from the conclusion that it was no less probable, in fact that it was more probable, that the injuries were caused by the plaintiff's practice in ventilating her chicken house with a large fan, considered with the fact that following the cleaning out of the droppings from the pens the concrete floor was washed with water, causing it to be and remain damp, than that it was caused by the change in feed.

There was also evidence of overcrowding among the plaintiff's chickens, and that such a condition makes for overheating, which in turn enhances the adverse effects of any draft to which they might be subjected. Although plaintiff gave another reason therefor, it is at least interesting to note that after the plaintiff resumed business, she reduced the pens in her house from eight to six. It was also shown that the common watering trough for the chickens in the pens on each side of the house, was bad, in that it was a medium through which disease was spread.

While inconsistent with her theory of liability, the foregoing evidence was not inconsistent with any evidence offered by the plaintiff and it stands undisputed in the record.

All the expert evidence was to the effect that the said practices by the plaintiff were dangerous to the health of the chickens and there is no evidence to the contrary.

It is true that one of the experts, Dr. Kent, was in the employ of the defendant company, but being un-

impeached in any way, this fact alone would not justify a refusal to accept his uncontradicted testimony. Bank of Hendersonville v. Dozier et al., 24 Tenn. App. 178, 142 S. W. (2d) 191; and Cf. Gouldener v. Brittain, 173 Tenn. 32, 114 S. W. (2d) 783.

In this connection, it is pertinent to note that after the experience which gave rise to the present controversy, the plaintiff, following the advice of experts, desisted from the practice of washing the concrete floors with water and thereafter so far as appears had no further trouble with the ailments of the type here involved. Just how long afterwards she discontinued the condemned practice does not clearly appear.

The evidence concerning this action on the part of the plaintiff does not come within the ban of the rule which holds that evidence of repairs subsequent to an injury is not relevant on the issue of negligence. In this case the evidence referred to was competent and relevant upon the principles described by Mr. Wigmore dealing with the probative value of evidence showing tendency, capacity, quality, cause or effect. Wigmore on Evidence, 1st Ed., Vol. 1, Sec. 441 et seq.

It is also pertinent that disease was present among the chickens some two or three weeks before the controversial change in feed. Sellars, the dealer from whom the plaintiff purchased her chicks, who was an experienced poultry raiser, after having testified that an abrupt change in the feed of chickens was not good practice, and that malnutrition made them more susceptible to disease, said that a disease which made its appearance within 24 hours after a change in feed would be attributable to some condition which existed before the change was made and not to the change or any malnutrition resulting therefrom.

There was other expert evidence to the same effect and none to the contrary.

As already said, it was shown by undisputed evidence that two or three weeks before July 5th, the date on which the controversial feed was first given the older chickens, one particular group of them were sick. The condition was serious enough that the plaintiff requested the local dealer Laman to have the defendant's representative Smith come to her poultry yard, examine her flock and advise her what to do. Smith came and found the chickens suffering from colds. He testified that at that time the windows were open, the fan was in operation and the concrete floor was wet. He recommended a laxative in the form of buttermilk and molasses, and the buttermilk not being available, the plaintiff had to be content with the molasses which was put in the drinking water. Plaintiff admits this experience, but says the trouble was confined to the chickens in one particular pen, just which she did not say, and that Smith did not attribute the illness to faulty ventilation. Nor did the plaintiff say whether as a result of the treatment the group of chickens involved recovered prior to July 5th, but viewing the evidence in the aspect most favorable to her, it may be inferred that they did so, at least ostensibly. The fact nevertheless remains that a short time before the occasion here in question there was present among the plaintiff's flock of chickens one of the diseases subsequently manifesting themselves, and, further, at that time and continuously thereafter prior to the loss in question, plaintiff was pursuing the above-described practices in ventilating the house and washing the concrete floor with water.

It is further pertinent that after the plaintiff had taken practical measures to disinfect her chicken house following the experience involved in the present controversy and had gotten rid of all of the chickens that had been on hand during it, disease of the same type appeared among new and healthy chickens which were put in her chicken house. She testified that when the illness developed in the flock, she cancelled all outstanding orders for chickens and bought no more "until I could get those chickens out of the house and I then cleaned out the house and sprayed it and then I got some more chicks and cared for them under the same program, continuing the Full-O-Pep Feed. . . . They were pretty healthy chicks. We put them in there and they stayed there three or four days and started drooping and dying. . . . I had to discontinue getting chicks until August, and then I got 2000 and then I had to cancel my order again and I did not get any more until November."

Upon the whole case we think the conclusion is inescapable that there was no substantial evidence to show the causal connection between the act of negligence charged and the injury suffered by the plaintiff to her chickens and that under the evidence proper for consideration upon the question, it was more probable that the injury was due to the practices followed by the plaintiff in caring for her chickens than that it was caused by the change in the feed resulting from the mislabeling of the bags.

Moreover, if, upon any view of the evidence, it could be said that the change in the feed was at all a factor in producing the illness among the chickens, still we think it cannot in reason be said to have been a sub-

stantial one within the meaning of the rule promulgated by the American Law Institute (Re-Statement of the Law of Torts, Vol. 2, Sec. 431), hereinabove quoted, which prevails in this jurisdiction. Spivey v. St. Thomas Hospital, Tenn. App., 211 S. W. (2d) 450, 451, 457. In commenting upon the considerations deemed important in determining whether negligent conduct is a substantial factor in producing harm, the Institute says this: "There are frequently a number of events each of which is not only a necessary antecedent to the other's harm, but is also recognizable as having an appreciable effect in bringing it about. Of these the actor's conduct is only one. Some other event which is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor. So too, although no one of the contributing factors may have such a predominant effect, their combined effect may, as it were, so dilute the effects of the actor's negligence as to prevent it from being a substantial factor." Re-Statement of the Law of Torts, Vol. 2, Section 467.

We think this comment is peculiarly applicable to the facts here.

It follows therefore that we think the defendant's motion for a directed verdict should have been sustained. The result is that the judgment is reversed and the suit dismissed. The cost of the cause including the cost of the appeal in error is adjudged against the plaintiff.

Baptist and Swepston, JJ., concur.