IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 22, 2003 Session

## TRUMBO, INC. v. WITCO CORPORATION

**Appeal from the Circuit Court for Shelby County**
**No. 70315-8 T.D.     D'Army Bailey, Judge**

———————————

**No. W2002-01186-COA-R3-CV - Filed August 11, 2003**

———————————

This case involves the loss of evidence. A metal fabrication company modified a fat melting tank for another company. Later, an employee of the melting tank company was severely injured by hot melted fat while working with the modified tank. Following the accident, as part of an investigation, the employer removed the two temperature gauges attached to the tank. The employer paid workers' compensation benefits to the employee. The employee then sued the fabrication company that modified the tank. The employer intervened to assert its statutory lien under the workers' compensation laws, so that it could recover any monies paid to the employee by the fabrication company. Five years after the accident, the fabrication company sought production of the temperature gauges from the employer, as part of its defense in the lawsuit filed against it by the employee. The employer was unable to locate the gauges. The fabrication company settled the lawsuit filed by the injured employee, and filed a claim against the employer for spoliation of evidence and negligence. The fabrication company argued that it was forced to settle the underlying lawsuit with the employee, in part because of the missing gauges. The trial court granted a motion for summary judgment in favor of the employer, finding that the employer did not have a duty to preserve the evidence and that the fabrication company had not established causation. The fabrication company appeals. We affirm, finding that regardless of whether the employer had a duty to preserve the temperature gauges, the fabrication company had not proffered evidence that the gauge would have materially assisted it in defending the lawsuit filed by the employee, and thus was unable to establish causation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Gary K. Smith and Sherry S. Fernandez, Memphis, Tennessee, for appellant, Trumbo, Inc.

James B. Summers and Richard S. Wade, Memphis, Tennessee, for appellee, Witco Corporation.

## OPINION

In 1993, Trumbo, Inc. ("Trumbo") a metal fabrication company, modified a fat flaking tank for Witco Corporation ("Witco"). Witco's business included the use of such fat flaking tanks to melt fat flakes into oil. On June 7, 1994, Witco employee Russell Ullery ("Ullery"), was operating the fat melting tank. The tank ejected hot oil on Ullery, severely burning him over most of his body. Witco's workers' compensation insurance provided benefits to Ullery.[1]

Later in 1994, Witco conducted an internal investigation of the cause of the accident, in order to prevent such an accident from happening again. Had proper procedure been utilized, Ullery would have engaged the agitator in the tank, to mix the fat as it melted, at a temperature of 130 to 150 degrees. The investigation team determined that, on the day Ullery was injured, he engaged the tank's agitator when the temperature of the liquified fat inside the tank was too high. The investigation team estimated that, at the time Ullery engaged the agitator in the tank, the temperature of the melted fat had reached approximately 220 degrees. The agitator caused water at the bottom of the tank to come into contact with a heating coil. The elevated temperature caused the water to instantly vaporize, which forced a substantial amount of the superhot oil out of the top of the tank and onto Ullery.

During the course of its investigation, Witco removed the two temperature gauges that were attached to the fat melting tank. Witco's investigation did not indicate that temperature gauge failure was a contributing factor in the accident.

On June 6, 1995, Ullery and his wife sued the metal fabrication company, Trumbo, under theories of failure to warn, negligence, and strict liability. They sought $10,000,000 in damages. As noted above, Ullery had previously received workers' compensation benefits from Witco. Consequently, Witco intervened in the Ullerys' lawsuit against Trumbo, in order to secure a statutory lien on any proceeds the Ullerys might recover from Trumbo.[2]

---

[1] The record and appellate briefs indicate that Ullery received $6,000,000 in workers compensation benefits, and that Ullery is now deceased.

[2] Section § 50-6-112(c)(1) of the Tennessee Code Annotated provides for such a lien. It states:

(c) (1) In event of such recovery against such third person by the worker, or by those to whom such worker's right of action survives, by judgment, settlement or otherwise, and the employer's maximum liability for workers' compensation under this chapter has been fully or partially paid and discharged, the employer shall have a subrogation lien therefor against such recovery, and the employer may intervene in any action to protect and enforce such lien.

Tenn. Code Ann. § 50-6-112(c)(1) (1991).

Ullery's lawsuit against Trumbo proceeded, and the parties engaged in considerable discovery. During the course of discovery, Trumbo learned that, in Witco's internal investigation of the accident, Witco had removed the two temperature gauges that were attached to the tank.

On May 12, 1999, nearly four years after Ullery filed his lawsuit and nearly five years after the accident, Trumbo requested production of the two temperature gauges from Witco. Witco searched for the gauges but was unable to find them. Witco's response to the request for production stated that "[t]he temperature gauges from the [tank] can not be found at this time."

Shortly thereafter, Trumbo answered Witco's intervening complaint and filed a counterclaim against Witco. In the counterclaim, Trumbo alleged that Witco intentionally destroyed the temperature gauges, and argued that this constituted spoliation of evidence and hindered Trumbo's defense of Ullery's claims against Trumbo. As a result, Trumbo argued that it should be indemnified by Witco for any damages Trumbo was required to pay to Ullery, that Witco was not entitled to subrogation, and that Witco had waived certain remedies because of the lost evidence. In response, Witco moved to dismiss Trumbo's counterclaim based on failure to assert a cause of action.

Trumbo then settled the underlying lawsuit filed by the Ullerys. After the settlement, only Trumbo and Witco remained in the lawsuit. On June 30, 2000, Trumbo amended its counterclaim against Witco, to expressly include claims of intentional spoliation of evidence, negligent spoliation of evidence, and negligence. Trumbo asserted that Witco should be responsible to Trumbo for the settlement Trumbo paid to the Ullerys, arguing that Trumbo was forced to settle because Witco's failure to produce the temperature gauges left Trumbo unable to defend itself against the claims filed by the Ullerys.

More discovery and depositions ensued. During the discovery, it was established that the temperature gauge at the bottom of the fat melting tank had not been operational for a number of years. Consequently, Witco employees operating the tank relied on the tank's second temperature gauge, located near a staircase. Four Witco employees gave deposition testimony that this second gauge was operational and registering temperatures both before and after Ullery's accident. Witco employee Stephen Black testified that the gauge was working during the two or three days prior to the accident and that, when Black arrived at the plant after Ullery's accident, the gauge registered 190 degrees. Employee Ester Earl testified that, after Ullery was injured and had been loaded into the ambulance, Earl went back to the fat melting tank and saw that the temperature gauge read 200 degrees. Employee Sylvester Leigh stated that, the week prior to the accident, the gauge was working, and that, after the accident, the gauge was registering temperatures between 200 and 225 degrees. Employee James Turner testified that he also went to the fat melting tank after Ullery was injured and taken away by the ambulance. At that time, Turner noted that the temperature gauge registered at least 200 degrees.

After the accident, both temperature gauges were removed from the tank. John Litten ("Litten") was a Witco employee at the time of the accident. Litten testified that, after the accident, the gauges were brought to him for testing on a calibration unit. At that time, neither gauge

functioned properly. In the course of the discovery, Litten produced a calibration certificate for the key gauge near the staircase; the certificate was dated June 14, 1994. Litten said that the gauges were broken when he received them, and that he knew of no tests that could be conducted after removal to determine if the gauges were working at the time of Ullery's accident.

Jim Armstrong ("Armstrong"), was a process engineer at Witco at the time of Ullery's accident. Armstrong stated that, after the gauges were tested, he made notations on the calibration certificate for the gauge located near the staircase. His note on this calibration certificate states: "Instrument twisted when being removed. Probably damaged instrument causing no reading." Based on the position of certain parts of the gauge, Armstrong deduced that the gauges were twisted during removal. He concluded that the damage sustained by the gauge during removal caused it to no longer be operational.

Armstrong noted that his supervisor had asked Litten to deliver the gauges to Armstrong after Litten completed his testing. After Litten tested the gauges, Litten put them on top of a file cabinet in Armstrong's office. Armstrong said that the last time he remembered seeing the gauges was in late 1994, when he moved out of his office into a new office. After that, the gauges could not be found.

On January 12, 2001, the trial court heard Witco's motion to dismiss. By the time of the hearing, Witco's motion to dismiss had been converted into a motion for summary judgement, since depositions and discovery materials were put before the trial judge for his consideration. At the hearing, Trumbo's counsel argued that Witco had a duty to preserve the gauges because of the special relationship that existed between Witco and Trumbo, and because at the time the gauges were removed, Witco knew that Ullery could potentially pursue a cause of action against Trumbo. The trial court inquired into Trumbo's ability to establish causation of its injury, that is, whether loss of the gauges actually hindered Trumbo's defense. Trumbo's counsel asserted that the question of whether the temperature gauges were functioning properly and would have been beneficial to Trumbo in the underlying lawsuit Trumbo settled with Ullery was a disputed fact for the jury to determine.

Witco's counsel argued that Witco had no duty to preserve the gauges. Witco noted that, at no point prior to Trumbo's request for production of the temperature gauges, years after the accident, did Trumbo ask for the gauges. Counsel for Witco contended that one gauge had been broken since long before the accident, and that the second gauge, relied upon by employees, was broken during removal for testing. Witco emphasized that neither Witco's internal investigation nor the lengthy discovery in the lawsuit had yielded any evidence that malfunction of the second gauge was a possible cause of the accident. Witco's counsel stated:

> There was never any question in anybody's mind at that time as to whether or not there was—that the gauges were a problem at the time of the accident.

. . . I will represent to the Court that there is no testimony in 75 depositions that anyone believed that the temperature gauge was not operating at the time that Mr. Ullery got burned. It's just not there. No one believed that. And so no one believed that there was a problem with the gauges and because of that, they went on.

Witco also emphasized that the undisputed evidence in the record was that, once the gauge was removed, there was no way to determine whether it was operating properly on the day of the accident:

The only testimony in this record relative to the value of those gauges for testing purposes—and this is it and this is all there is and it is undisputed—the only testimony in this record is that there are no tests, none whatsoever that can be performed on a temperature gauge as they existed at the time that they were tested at Witco in 1994.

There are no tests that would tell us, one, whether it was working at the time of the incident and, two, what the temperature would have been. That's in the record. It is undisputed. There have been no countervailing affidavits.

They have not come forward with another expert who says, oh, no, no, if I had those gauges, I could show this, I could show that. Oh, I could do all kinds of stuff. That is absolutely undisputed, Your Honor.

That was one of the questions that was asked of Mr. Litten who came back for a second deposition and he was asked that very question, if you had—are you aware of any tests in this industry that would enable you to be able to determine whether or not what the temperature would have been, no; whether they were working at the time of the accident, no. Once they're broken, they are broken.

And what happened was that the gauge got snapped, twisted. Somehow or another the face got twisted in the process of removal. That's the surmise. It is disputed. But nevertheless, they know that it didn't work at the time of the test. No more, no less, that's all they know, it didn't work at the time of the test.

But since they had eyewitness testimony that said it was working, they saw it three—there are three different temperatures that are in the record that show what the temperatures were shortly after the accident . . . . So there is evidence, substantial evidence in the record that the gauges were working at the time of the accident.

Based on this, Witco contended, the undisputed evidence established that the second gauge was working on the day of the accident, it did not work after both gauges were removed, and even if the gauges had been produced, there was no way to test whether either was working properly on the day of the accident.

At the conclusion of the hearing, the trial court found that Witco had no duty to preserve the gauges and that, even if Witco had such a duty, Trumbo failed to establish causation. The trial judge stated:

> I don't believe that there is a duty on the part of Witco to reserve those gauges under the facts as they have developed in this case. . . .
>
>       . . . .
>       . . . [E]ven if there were such a duty, it would be the element of causation and I do not believe that Trumbo can establish causation of damage to it by the claimed breach in anything more than a final degree of speculation on the trier of fact which would not be admissible at law, and accordingly, I grant the motion [for summary judgment].

Thus, Witco's motion for summary judgment was granted because the trial court found that (1) Witco had no duty to Trumbo to preserve the temperature gauges, and, (2) even if Witco had such a duty to Trumbo, Trumbo could not establish causation of damage to it because of the missing temperature gauges. The trial court entered a written order for the grant of summary judgment on January 26, 2001. From this order, Trumbo appeals.

On appeal, Trumbo argues that the trial court erred in finding that Witco had no duty to preserve the temperature gauges and that Trumbo could not prove causation, and thus erred in granting Witco's motion for summary judgment. Trumbo also asserts that this Court should adopt an independent cause of action for spoliation of evidence.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04. The burden of demonstrating that no genuine issue of material fact exists is placed on the party moving for summary judgment. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.* Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Because only questions of law are involved, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *Bain*, 936 S.W.2d at 622; *Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

We first address Trumbo's argument that the trial court erred in finding that it could not establish causation. Trumbo claims that the issue of causation was a question for the jury, and that consequently summary judgment was improper. Trumbo asserts that the outcome of the underlying lawsuit filed against Trumbo by the Ullerys would have been different had Trumbo had the opportunity to evaluate the temperature gauges. They argue that Witco would not have removed and tested the gauges if the functioning of the gauges had not been an issue during Witco's investigation of the accident. Trumbo contends that its inability to test the gauges precludes establishment of the

-6-

fact that no tests could be performed to determine if the temperature gauges were working at the time of Ullery's accident.

In a negligence action, the plaintiff must prove that the defendant owed the plaintiff a legal duty, that the defendant's conduct fell below that duty, that the plaintiff was injured, that the defendant was the cause-in-fact of the injury, and that the defendant was the proximate cause of the injury. *See Roe v. Catholic Diocese of Memphis, Inc.*, 950 S.W.2d 27, 31 (Tenn. Ct. App. 1996) Cause-in-fact, or causation, has been described as "the injury or harm [that] would not have occurred 'but for' the defendant's negligent conduct." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). Regarding causation, this Court has said that:

> Causation, or cause in fact, concerns the relationship between the defendant's conduct and the plaintiff's injuries. *See Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). The inquiry is whether the defendant's conduct caused the harm to plaintiff. *See Quaker Oats Co. v. Davis*, 232 S.W.2d 282, 294 (Tenn. Ct. App. 1949). This inquiry is one for the jury to determine, "unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *Roe v. Catholic Diocese of Memphis, Inc.*, 950 S.W.2d 27, 31 (Tenn. Ct. App. 1996).

*Hamblen v. Davidson*, 50 S.W.3d 433, 440 (Tenn. Ct. App. 2000). Thus, although causation is normally a question of fact for the jury, if the inferences drawn from the evidence can lead reasonable minds to only one conclusion, the issue of causation is for the court, not for the jury.

In the case at bar, the inferences drawn from the undisputed evidence lead to only one conclusion. The evidence is uncontroverted that Witco's internal investigation of the accident indicated that the temperature gauge normally relied upon by Witco's employees was functioning at the time of the accident and was not a contributing factor to Ullery's accident. Four employees testified that they saw the temperature gauge in question register certain temperatures either prior to or after the accident. The consistent testimony was that the temperature reading after the accident was well above the range of safe temperatures for engaging the tank's agitator. The uncontroverted evidence also indicates that the key gauge was broken when it was removed by Witco for its investigation. Once this gauge was broken, the undisputed evidence was that there were no tests to determine whether the gauge was operating properly on the day of Ullery's accident. Trumbo proffered no evidence to the contrary on any of these points. Under these circumstances, there is no evidence in the record from which a jury could reasonably conclude that, had the temperature gauges been produced to Trumbo in response to its discovery request, it would have benefitted Trumbo's defense of Ullery's claims against Trumbo. Accordingly, we must conclude that the trial court did not err in holding that Trumbo could not establish causation. Thus, the trial court did not err in granting summary judgment to Witco on this basis. This holding pretermits Trumbo's argument regarding Witco's duty to preserve the temperature gauges. In addition, in light of our holding on causation, we decline to consider recognizing the tort of spoilation of evidence in this appeal.

The decision of the trial court is affirmed. Costs are taxed to the appellant, Trumbo, Inc., and its surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, J.