Ann E. BIBLER, Admx. of the Estate of Ralph Bibler, Deceased, et al., Plaintiffs-Appellants,

v.

Berry H. YOUNG, Jr., et al., Defendants-Appellees.

UNITED STATES of America, and the Federal Aviation Administration, Third-Party Plaintiffs-Appellants,

v.

Berry H. YOUNG, Jr., et al., Third-Party Defendants-Appellees.

Nos. 73–1201, 73–1202.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1973.

Decided Feb. 27, 1974.

---

Harry L. Riggs, Jr., Erlanger, Ky., and Michael Pangia, Washington, D. C., for plaintiffs-appellants; Riggs & Riggs, Erlanger, Ky., Nelson Lancione, Columbus, Ohio, Harlington Wood, Jr., Asst. Atty. Gen., William W. Milligan, U. S. Atty., Leonard Schaitman, Joseph B. Scott, Attys., Dept. of Justice, Washington, D. C., on briefs.

David L. Day, Columbus, Ohio, for defendants-appellees; Collis Gundy Lane, Lane, Alton & Horst, Columbus, Ohio, on brief.

Before WEICK, EDWARDS and CELEBREZZE, Circuit Judges.

EDWARDS, Circuit Judge.

The widow of a deceased airplane pilot and instructor appeals from the judgment of the United States District Court for the Southern District of Ohio dismissing her complaint. The District Judge who tried this case without a jury found for the defendants on the ground of contributory negligence on the part of her husband who was killed in an airplane crash. The suit was brought under the Federal Tort Claims Act (28 U.S.C. § 1346(b) (1970)), by Ann Bibler, as Administratrix of her husband's estate, on behalf of herself and their minor child against the United States and the Federal Aviation Administration, the operator of the control tower at the Columbus, Ohio, airport where the crash occurred. She also sued the owner and operator of the other aircraft which collided with Bibler's plane. The United States answered denying negligence and claimed indemnification against defendants Young and Ohio Aviation Distributors, Inc., the operator and the owner of the other plane.

By stipulation of the parties, another related state case was submitted to the court wherein Sundin, the owner of the plane in which Bibler was killed, sued all the same defendants for property damage occasioned by their claimed negligence. In turn Ohio Aviation counterclaimed for the damages to its plane.

The cases were heard before Judge Rubin in the United States District Court for the Southern District of Ohio. Judge Rubin held that the plaintiffs' claims were barred by the contributory negligence of the deceased pilot, Bibler, in that "He failed to advise the Local Control that he had passed the outer marker" in making a simulated landing at Port Columbus International Airport, and in that he failed to make and maintain radio contact with the Local Controller while over the airport area. The District Judge held that pilot Young was not guilty of negligence and awarded $17,000 damages to Ohio Aviation for the damage to the plane Young was flying. He also held that the approach controller at the Port Columbus Airport was guilty of negligence for failing to tell pilot Bibler to contact Local Control. But he held that this negligence was not the proximate cause of the accident. The District Judge also held that the Local Controller at the Port Columbus Airport was not guilty of negligence.

■ There were four parties involved in this air collision which resulted in the death of two people. This record, as we view it, indicates that any one of the four might have prevented the crash. But actionable negligence does not consist of failing to take extraordinary measures which hindsight demonstrates would have been helpful. It consists of

doing or failing to do what a reasonable man would do under the circumstances confronting him.

This appeal disputes the interpretation of the applicable rules and regulations and the inferences from the facts drawn by the District Judge. Many of the facts in this case were stipulated and none of them are currently in dispute.

We recite them from the District Judge's findings of fact:

## "FINDINGS OF FACT

### Finding of Fact (1)

General Conditions at Columbus International Airport

Columbus International Airport, known by pilots as CMH, is located in Franklin County, Ohio, immediately east of the City of Columbus. Its main runways lie in an east-west direction. Airport runways are identified by the first two digits of direction. Accordingly, the two main runways of Port Columbus are 28 left and 28 right, indicating an east to west bearing of approximately 280 degrees. When used west to east the same runways are known as 10 left and 10 right, signifying a heading of approximately 100 degrees. The precise magnetic bearing of 28 left and 28 right is 276 degrees.

Runway 28 left is 10,700 feet long and 150 feet wide. It is equipped for instrument landing and includes an electronic extension in the same compass heading referred to as a 'beam.' At a point 5.4 nautical miles (6.2 statute miles) east of runway 28's left threshold is the 'outer marker.' An outer marker is an electronic device that advises a pilot when he has passed over it on his way to a landing.

Between the outer marker and the runway threshold there is a middle marker which likewise electronically advises the pilot that he has passed over such marker. A pilot may receive such information by a Beacon Marker Indicator which will cause a light to flash on the instrument panel and an audible radio signal to be given, or by a low frequency ADF receiver which will receive in Morse Code the identifying letters of the marker. The outer marker on runway 28 left is identified by the letters CM and is known by the term 'Charlie Mike.'

A plane need not contain such equipment in order to use part of the electronic extension of runway 28 left. A plane can be equipped merely to ascertain its position in relation to the electronic extension or 'localizer beam' and be guided onto the localizer for ultimate landing on the runway.

The control of traffic in and around the Columbus Airport is a function of the Federal Aviation Administration. This facility operates from the Columbus control tower. There is a separation of function between Approach Control (APC) which monitors by radar traffic which is outside of a five mile radius from the tower, and Tower Control, also known as Local Control (TWR),[1] which has jurisdiction over air traffic within the five mile radius. APC operations extend for approximately forty miles around Port Columbus. Local Control is housed at the top of the control tower. In 1968, when this accident occurred, Local Control did not have radar equipment and relied on visual sightings to identify and direct landing aircraft. The two control departments communicate with pilots on assigned frequencies: APC on 119.0 megahertz and TWR on 121.5. Because their jurisdictions are exclusive, pilots do not customarily communicate with both departments simultaneously.

When a pilot is flying under instrument flight regulations (IFR), he communicates with Approach Control until he reaches the outer marker. At this time he is advised to contact Local Control in the tower on its frequency and

---

1. The terms Local Control, Local Tower or Tower as used herein are synonymous and are all identified as TWR.

report his presence. When a pilot is flying under visual flight regulations (VFR) he is not required to advise Approach Control of his presence, but contacts instead Local Control when he is in the vicinity of the outer marker.

### Finding of Fact (2)

#### Cherokee N42 39J (39 Juliet) [2]

On April 10, 1968, Ralph D. Bibler, decedent, was a duly qualified and licensed commercial pilot and flight instructor with over 1000 hours of pilot flight time. He was in command of a Piper Cherokee aircraft, Registration No. N4239J. At approximately 3:00 p.m. on that date, he was instructing a student, one David Dunnick, in the procedures for instrument landing at Port Columbus. Mr. Dunnick had logged 123 hours of flight time. The plane was equipped with an omni-converter for localizer guidance. It was not equipped with an ADF radio Beacon Marker Indicator or any other electronic means of establishing position in relation to the outer marker. Prior to 3:00 p.m., 39 Juliet was operating under Instrument Flight Regulations (IFR) procedures with student Dunnick at the controls. Dunnick was wearing a 'hood,' a vision limiting device which focused his attention upon the instrument panel. As the operating pilot student Dunnick occupied the left hand seat. Instructor Bibler occupied the right hand seat. Weather conditions at Port Columbus on April 10, 1968, were such that visual flight regulations (VFR) were in effect. Proceeding under IFR conditions in a VFR day placed an obligation upon Bibler to act as 'safety pilot' and observe the classical admonition under VFR conditions of 'see and be seen.'

### Finding of Fact (3)

#### Bonanza N8318N (18 November)

Defendant Berry D. Young, a retired United States Air Force Lieutenant Colonel, on April 10 was piloting Beechcraft Bonanza No. N8318N. Defendant Young at the time had logged in excess of 7,000 hours of pilot flight time. He was employed as a salesman by defendant Ohio Aviation Company, a distributor of Beechcraft products. The instrument equipment of 18 November is not significant since Young was flying, on the date in question, under VFR conditions. One such instrument, the air speed indicator, was known to be inaccurate in its operation. Mr. Young had taken off at approximately 14:30 (2:30 p.m.) from the Wood County Airport at Parkersburg, West Virginia. At 1500 (3:00 p.m.) he was proceeding in a westerly direction parallel to Interstate 70 and immediately south thereof. His direction would approximate the magnetic heading of runway 28 and he would be approximately 2 miles south of an eastward projection thereof. He first contacted Local Control at 1504 (3:04 p.m.) locating himself '2 miles south of Charlie Mike' (outer marker).

### Finding of Fact (4)

#### Approach Control (APC)

Approach Control at the Port Columbus tower was made aware of the presence of 39 Juliet at 1440:54 (2:40 p.m.). Its pilot requested a practice instrument approach at the Port Columbus Airport. In answer to its question Approach Control was advised that 39 Juliet was rated and equipped for an ILS approach. It is a matter of definition whether it was so equipped. 39 Juliet could electronically locate the localizer beam; it could not electronically find either the outer marker or the middle marker. The outer marker at Port Columbus can be visually determined and on the first ILS approach, Local Control was advised when 39 Juliet passed the marker. This was in accordance with previous instruction from Approach Control. An ILS practice approach is treated as a missed

---

2. There is an identification system used by pilots and controllers which involves the last two digits and letter of a plane's registration. Specific words are used to avoid letter confusion. Thus Cherokee N4239J was known as "39 Juliet" and Bonanza N8318N was referred to as "18 November."

approach. 39 Juliet was instructed to execute a right turn to heading 50°, ascend to an altitude of 2,700 feet and return to the frequency of Approach Control. At 1457:50, 39 Juliet did so return and was guided or 'vectored' in a clockwise direction for a second approach to the runway. Thereafter Approach Control gave 39 Juliet the following instructions: 1500:16 heading 100°; 1501:25 heading 180°; 1502:26 heading 260°.

At 1503:47, 39 Juliet was noted by Approach Control as 'on the localizer a mile from the marker.' At no time did Approach · Control have radio contact with 18 November. APC was, however, aware that 18 November would land on runway 28 left.

### Finding of Fact (5)

### Local Control (TWR)

Local Control did not have in 1968 a radar scope that would assist its controllers (or Tower Control) in locating and monitoring a specific plane. The tower controllers were required to make visual locations assisted by binoculars when those were indicated. TWR had contact with 39 Juliet on the first approach from 1449, when it was advised that 39 Juliet had passed the outer marker, until 1457:50, when the pilot returned to the frequency of Approach Control. At 1503:23 TWR was advised that 39 Juliet was on the localizer. Approach Control advised that if 39 Juliet got in TWR's way he was to be turned south.

Approximately 37 seconds later at 1504, 18 November advised TWR that he was 2 miles south of Charlie Mike for landing. TWR instructed 18 November to land on runway 28 left number two following a flight of Lake Central Airlines in a Nord aircraft. This transmission included notice of traffic coming upon the outer marker intending an ILS low approach. The term 'low approach' or 'low go' refers to a landing approach that will not be completed.

At no time after 1457:50 was there radio communication between 39 Juliet and Local Control although no later than 1504:47, 39 Juliet did in fact cross the outer marker. 39 Juliet never contacted TWR during the time it was inside the outer marker. Its last advice at 1507:45 was made to Approach Control and its radio in the wreckage was found to be tuned to 119.0 mg. Approach Control frequency (Ex. 45 at 8).

### Finding of Fact (6)

### Time and Location

In midair collision cases, the relative positions of the aircraft are of sufficient importance to be considered in detail. The Court finds that the positions of the two aircraft over the crucial period of time prior to their crash, were as follows:

| POSITION | | |
| --- | --- | --- |
| | 39J | 18N |
| *Prior to 1500* | | |
| 1459:07 | North East of Tower 2 mi. heading 50° | Unknown — heading westerly from Parkersburg, W. Va. |
| *1500–1501* | | |
| 1500:16 | Heading 100° | Unknown — heading westerly from Parkersburg, W. Va. |
| *1501–1502* | | |
| 1501:25 | Heading 180° | Unknown — heading westerly from Parkersburg, W. Va. |
| *1502–1503* | | |
| 1502:26 | Heading 260° | Unknown — heading westerly from Parkersburg, W. Va. |
| *1503–1504* | | |
| 1503:23 | On the localizer | Unknown — heading westerly from Parkersburg, W. Va. |
| 1503.47 | On the localizer a mile from the marker | Unknown — heading westerly from Parkersburg, W. Va. |
| *1504–1505* | | |
| 1504:14½ | On the localizer | 2 mi. s. of Charlie Mike |
| 1504:44½ | On the localizer | down by Pandora's Box |
| *1505–1506* | | |
| 1505:34 | On the localizer | South of the approach course |
| *1506–1507* | | |
| 1506:41 | On the localizer | In sight [of Tower] |
| *1507–1508* | | |
| 1507:45 | A beam Western Electric | |

### Finding of Fact (7)

### Knowledge of Parties

(A) Knowledge of 18 November— After contacting Local Control at 1504,

Young was advised to plan to land on runway 28 left following the Lake Central Nord and to watch traffic coming up on the outer marker making an ILS low approach. The term, 'coming up on the outer marker,' indicates a position of such traffic at that time east of the outermarker. Because only 13 seconds had elapsed from the location of 39 Juliet at one mile from the outer marker, this statement was correct. At 1505:47 he was advised of the Lake Central Nord about a mile out of the airport and cleared to land on runway 28 left.

(B) Knowledge of 39 Juliet—Following the vectoring that had ended at 1502:26, 39 Juliet had received from Approach Control a clearance for a straight in ILS 28L approach. At 1503:47 he was advised that he was on the localizer one mile from the outer marker and spaced in reference to a Lake Central Nord three miles north of the airport. The term 'spaced in reference to Lake Central Nord' is not a clearance to land nor is it a landing sequence. At 1507:45, 39 Juliet knew he was inside the outer marker since he advised Approach Control 'a beam of Western Electric.' No conversation at any time in this approach was had with Local Control.

(C) Knowledge of Approach Control —At 1502:26 Approach Control knew that 39 Juliet was heading 260° intending another missed approach. At 1503:47 he knew that 39 Juliet was on the localizer one mile from the outer marker. At 1504:34 Approach Control knew that 18 November was intending to land on 28 left. At 1504:44½ Approach Control knew that 18 November was in the vicinity of Pandora's Box heading for the approach to 28 left. At no time did Approach Control speak to 18 November. Alone of the four parties involved, Approach Control possessed all of the critical information. Two planes no more than three miles apart were planning to use the same runway ap-proach and were converging thereon. The radar scope that had previously located 39 Juliet 'one mile from the outer marker' and 18 November 'down by Pandora's Box' was available to alert Approach Control of the decreasing separation between the two planes.

(D) The knowledge of Local Control —At 1503:23 he knew that 39 Juliet was on the localizer. At 1504 he knew that 18 November was 2 miles south of the outer marker. At 1505:44* he knew that 18 November was south of the approach and could see the Lake Central Nord. At 1505:51 he was advised that 18 November would land a little long. At 1506:41 he had 18 November in sight and cleared him to land on runway 28 left. He had no precise knowledge of the location of 39 Juliet. Neither the communication of 1503:47 identifying 39 Juliet one mile from the outer marker nor the communication of 1507:45 identifying 39 Juliet 'just a beam of Western Electric' was received by the Tower since these communications were on Approach Control frequency. Bearing on local control's lack of knowledge concerning the location of 39 Juliet is the fact that as late as 1507:44 he inquired whether that plane was within the outer marker." (Footnotes 3, 4 and 5 omitted.)

 The law applicable to this Federal Tort Claims Act action is, of course, that of the State of Ohio, where the accident occurred. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L. Ed.2d 492 (1962). Ohio law makes no provision for a comparative negligence, and as the District Judge held, it bars recovery to any plaintiff whose negligence contributed as a proximate cause to the happening of the accident.[1] Bahm v. Pittsburgh & Lake Erie Rd. Co., 6 Ohio St.2d 192, 217 N.E.2d 217 (1966); Drown v. Northern Ohio Traction Co., 76 Ohio St. 234, 81 N.E. 326 (1907).

---

1. Plaintiff is suing as Administratrix of the estate of her deceased husband, and hence, his contributory negligence would bar her claim.

As we have indicated, the District Judge held that Bibler's contributory negligence consisted of failing to contact the Tower as he passed the outer marker and failing to maintain radio contact with the Tower while in the airport traffic area.

It is appellant's contention, however, that since Bibler was in contact with Approach Control, he was in contact with the Tower and that he was under no legal duty to report his passing of the outer marker.

We believe that several Federal Aviation Administration Regulations are applicable:

(1) The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft. 14 C.F.R. § 91.3 (1973).

(2) *Communications with control towers operated by the United States.* No person may, within an airport traffic area, operate an aircraft to, from, or on an airport having a control tower operated by the United States unless two-way radio communications are maintained between that aircraft and the control tower. However, if the aircraft radio fails in flight, he may operate that aircraft and land if weather conditions are at or above basic VFR weather minimums, he maintains visual contact with the tower, and he receives a clearance to land. If the aircraft radio fails while in flight under IFR, he must comply with § 91.127. 14 C.F.R. § 91.87(b) (1973).

(3) The pilot in command of each aircraft operated under IFR in controlled airspace shall have a continuous watch maintained on the appropriate frequency and shall report by radio as soon as possible—

(a) The time and attitude of passing each designated reporting point, or the reporting points specified by

ATC, except that while the aircraft is under radar control, only the passing of those reporting points specifically requested by ATC need be reported;

(b) Any unforecast weather conditions encountered; and

(c) Any other information relating to the safety of flight. 14 C.F.R. § 91.125 (1973).

(4)(e) *Overtaking.* Each aircraft that is being overtaken has the right of way and each pilot of an overtaking aircraft shall alter course to the right to pass well clear.

(f) *Landing.* Aircraft, while on final approach to land, or while landing, have the right of way over other aircraft in flight or operating on the surface. When two or more aircraft are approaching an airport for the purpose of landing, the aircraft at the lower altitude has the right of way, but it shall not take advantage of this rule to cut in front of another which is on final approach to land, or to overtake that aircraft. 14 C.F.R. § 91.67(e) & (f) (1973).

Likewise applicable to our problems on this appeal is a sentence from the Airman's Information Manual:

"During the time an IFR flight is operating in VFR weather conditions, it is the direct responsibility of the pilot to avoid other aircraft, since VFR flights may be operating in the same area without knowledge of ATC (air traffic control)." *Airman's Information Manual* (AIM, 1–58).

Of similar applicability is a Port Columbus regulation which places on the Approach Controller the specific duty of telling the pilot of an airplane which he has cleared for an approach to contact Tower Control when he reaches the final approach fix. Terminal Air Traffic Control Manual, Rule 674(d).

With these facts and these rules and regulations in mind, we conclude that

the District Judge's finding of contributory negligence on the part of pilot Bibler must be affirmed and therefore the two original causes of action were properly dismissed.

Under Rule 52(a) of the Federal Rules of Civil Procedure, this court cannot set aside the findings of fact of the District Judge unless we can say that they are "clearly erroneous." Judge Rubin's findings are not only not "clearly erroneous"; we believe they are supported by the great weight of the evidence in this record. Indeed, as pointed out above, aside from interpretations of the regulations and inferences from the facts, they are undisputed. ·

■ We now turn directly to Judge Rubin's conclusions pertaining to pilot Bibler's contributory negligence. Like the District Judge, we believe that 14 C.F.R. § 91.87(b) (1973), specifically forbids operating any aircraft within an airport traffic area (described at the time as within five miles of the Tower and below 2,000 feet) which airport has a control tower operated by the United States "unless two-way radio communications are maintained between that aircraft and the control tower." Like the District Judge, we reject the appellant's contention that Bibler satisfied this rule by maintaining two-way radio contact with the Approach Controller. This record which contains much expert testimony, demonstrates conclusively that when the term "Control Tower" or "Tower" is used in connection with operations "within an airport traffic area," the terms refer to local control and not to approach control. This conclusion is strengthened by the fact that under visual flight conditions, such as prevailed on the date of this accident, Approach Control would not routinely have radio contact with in-bound traffic. Like Young's plane (18N), such traffic would ordinarily report only to the Tower (local control) at the outer marker. Thus Approach Control would be powerless to talk to or guide away from danger most of the planes within the airport traffic area.

■ Since the State of Ohio has adopted Federal Air Regulations as its own (*See* Ohio Rev.Code, §§ 4561.05, 4561.14), we believe that Bibler's violation of 14 C.F.R. § 91.87(b) was also a violation of Ohio law, and negligence per se. Maryland Casualty Co. v. United States, 251 U.S. 342, 349, 40 S.Ct. 155, 64 L.Ed. 297 (1920); Eastern Airlines v. Union Trust Co., 221 F.2d 62, 95 U.S. App.D.C. 189, aff'd sub nom. United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955).

■ We also affirm the District Judge's conclusion that pilot Bibler was guilty of contributory negligence in failing to "advise local control that he had passed the outer marker."

Strangely, the federal regulations on this score (*See* § 91.125 previously quoted) are not sufficiently definite to support this conclusion as a matter of law. But this record shows that the weight of the expert evidence does support the District Judge's statement in this regard. The testimony of expert witness Culley is persuasive:

Q. And as a pilot, when an aircraft is making an actual or simulated ILS approach, is there anything the pilot must do in passing over the outer marker as required by good operating procedures?

A. Yes, he should most definitely report the final approach fix or the outer marker in this case to the local controller or to approach control.

THE COURT: Mr. Pangia, excuse me just a moment. May I ask you a question in this regard: You said he should.

THE WITNESS: Yes, sir.

THE COURT: Now, does that mean he must or is it just good practice to do so?

THE WITNESS: It is not required by Federal Air Regulations that he do so, but it is a part of the recom-

mended air traffic control procedures on which all instrument flying is predicated.

THE COURT: Okay. His failure to do so does not subject him to any discipline? Aside from the question of negligence, I don't want to get into that, but his failure to do as you stated is not a violation of any of the FAA regulations?

THE WITNESS: No, sir, it is not.

THE COURT: Thank you. You may proceed.

Q. (By Mr. Pangia) Is it fair to say, Mr. Culley, that there are many things which pilots should do in the operation of the aircraft that are not spelled out exactly in the Federal Aviation Regulations?

A. Absolutely.

Q. Mr. Culley, if an aircraft was making an ILS approach, practice or otherwise, and he was not told to change from approach to the tower frequency, what, if anything should the pilot do?

A. As a pilot, if he has not been told to report or instructed to report as he approaches the marker, he should query approach control as to whether or not he wants him to change frequency to local control. If in the event we have a frequency congestion and he can't get to him or can't get a reply, he automatically changes to local control, the reason being, if I may say, as a pilot, I am interested in the traffic ahead of me. If I continue to monitor approach control frequency, I am only getting traffic that is behind me and to the side of me. If I am on the tower frequency, I can hear other traffic and communication with the tower, and I can determine their position from that report.

Q. And if an aircraft were not making a radar approach, Mr. Culley, would he get his landing sequence and clearance to land from the local controller?

A. Landing sequence and clearance to land is assigned by the approach controller under these conditions.

Q. I am sorry.

A. I beg your pardon, under tower control.

Q. Is it done by the approach controller in that condition?

A. No, sir, it is not.

While we recognize that Culley's testimony might be affected by his employment with defendant, Federal Aviation Administration, other witnesses, including plaintiff Sundin (owner of the plane Bibler was flying) furnish confirmation of the essential points of this testimony.

Finally, the Airman's Manual contains this paragraph:

*Report Leaving Final Approach Fix*

Pilots conducting a prescribed instrument approach are reminded of the importance of reporting to ATC or an FSS when over the final approach fix on final approach. ATC may predicate separation between departures and arrivals and between successive arrivals on the basis of this report; therefore, failure to make this report may compromise separation criteria. *Airman's Information Manual*

This instruction is vividly underlined by the comment of the Local Controller immediately after the mid-air collision on April 10, 1968:

"He [Bibler (39J)] never called me at the marker."

■ Since pilot Bibler's failure to report at the Marker or to contact Local Control deprived Local Control of knowledge that Bibler's plane (39J) had passed the marker and was in proximity of Young's plane (18N), it served to prevent action by Local Control to warn and separate the converging planes. It also served to deprive Bibler of knowledge of Young's clearance to land and Young of Bibler's presence within the airport traffic area. Clearly the negli-

gence we have described on Bibler's part was a proximate cause of the accident. Such contributory negligence under the Ohio cases cited earlier bars recovery by either plaintiff Administratrix or plaintiff Sundin in the original actions, regardless of whether or not the negligence of the Approach Controller (in failing to tell Bibler to switch to Local Control) contributed as a proximate cause also.

■■ There remains for our consideration only appellant's vehement protest against recovery by Ohio Aviation of the $17,000 worth of damages suffered by the Bonanza 18N piloted by appellee Young. Here appellant relies upon a regulation which places the burden of yielding the right of way upon an overtaking plane (See 14 C.F.R. § 91.67), i. e., upon Young. Since visual flight conditions prevailed at the time and place concerned, the fact that neither pilot ever saw the other is apparently explained by the fact that Young's plane (18N) was both above and behind Bibler's, and hence, as found by the District Judge, Young could not see Bibler and Bibler could not see Young because of the configuration of their planes.

At the time and place concerned Young had a clearance to land and was proceeding according to it. Bibler did not have a clearance to land; he had only a clearance to approach. Thus, under 14 C.F.R. § 91.67(f), Young had the right of way over Bibler. At the time and place concerned Young did not know that what turned out to be Bibler's plane (39J) was even in the airport traffic area. Expert testimony supports the District Judge's conclusion that Young's failure to take extraordinary measures to observe below him by side slipping and veering off his course (while landing) was not negligence—even though by hindsight such action might well have prevented the accident.

For these reasons and others spelled out in the District Judge's Findings of Fact Opinion and Conclusions of Law, the judgments of the District Court are affirmed.