William N. **RIMER** et al.,
Plaintiffs-Appellants,

v.

**ROCKWELL INTERNATIONAL CORPORATION,**
Defendant-Appellee.

No. 78–3380.

United States Court of Appeals,
Sixth Circuit.

Argued June 5, 1980.

Decided Feb. 19, 1981.

Rehearing Denied April 1, 1981.

Wilbur C. Jacobs, Reiser, Jacobs, Zraik & Szyperski, Toledo, Ohio, for plaintiffs-appellants.

James M. Tuschman, Shumaker, Loop & Kendrick, Thomas G. Pletz, Toledo, Ohio, for defendant-appellee.

Before LIVELY and JONES, Circuit Judges, and PECK, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

William N. Rimer and Crow, Inc. (Crow) appeal from a jury verdict in favor of the defendant, Rockwell International Corporation (Rockwell).

Rimer, Crow, and Crow's insurer filed this action based on negligence and strict liability after Rimer was forced to land an Aero Commander 520 in a cornfield because all the fuel siphoned out of its fuel tanks. They alleged that the Aero Commander's fuel system was defectively designed and that Rockwell was willfully negligent because it failed to warn about these design defects. Rockwell raised affirmative defenses which alleged that Rimer was contributorily negligent and that he assumed the risk. Because the district court erred in holding that Rimer was contributorily negligent as a matter of law and because it erroneously excluded evidence, we reverse.

## I.

The Aero Commander 520 was first manufactured in 1952. It is a twin engine plane designed to carry a small number of people and operate from short runway airfields. The Civil Aeronautics Administration (CAA) certified it as airworthy.

The Aero Commander 520's fuel system is composed of five interconnected rubber lined fuel tanks. This system supplies both the plane's engines. Interconnected fuel tanks are simpler to operate than a fuel

system with independent tanks which requires the pilot to switch tanks as fuel is used.

The single gas intake for the fuel system is located on top of the wing. When the plane is in flight negative pressure siphons the fuel from the tank if the cap is not properly fastened or if it is lost in flight. Siphoning will eventually empty all the tanks because they are interconnected.

Although fuel siphoning is dangerous because of the unexpected loss of fuel, it is still more dangerous in Aero Commanders. When siphoning occurs the rubber lining in the fuel tank collapses on the float which controls the fuel gauge on the pilot's instrument panel. As a result, the fuel gauge continues to indicate that there is fuel in the tanks in spite of the siphoning. When this occurs, the engines quit without warning.

The first two hundred and thirty Aero Commanders which were manufactured used military specification fuel caps. In 1952, the CAA approved this cap. It did not have the safety features incorporated in new fuel caps. The military specification fuel cap has a single "handle attach pin" (hinge pin) which connects the cap's handle and the inner part of the cap. If the hinge pin is broken the cap's inner flanges will not lock properly when the cap is fastened in place. Although the cap's handle must be folded down after the cap is in place to properly secure the cap, this can be done even if the hinge pin is broken.

In 1955, Rockwell replaced the military specification fuel cap with a cap manufactured by Shaw Aero Devices. The Shaw Cap was a positive locking cap and had a hinge which could not be folded down unless the cap was properly locked.

In November, 1966, Rockwell issued an optional custom kit designed to replace the fuel caps on Aero Commanders with a non-siphoning fuel cap. The non-siphoning cap has an inner cap at the mouth of the fuel line which is spring loaded to remain shut. The inner cap prevents siphoning even if the main cap is left off. At the time the custom kit was issued a Rockwell memorandum revealed that the anti-siphoning cap "was purposely put out as a Custom Kit rather than as a mandatory service bulletin in an effort to prevent operators from pressing litigation." A mandatory service bulletin would have required the owners of Aero Commanders to install the non-siphoning cap.

In 1969, the Federal Aviation Administration (FAA) required all new twin engine plans to be equipped with non-siphoning caps. All Aero Commanders built after this time were equipped with non-siphoning caps.

In January, 1973, Rockwell issued a mandatory service bulletin for all Aero Commanders with military specification fuel caps. The bulletin required the owners of Aero Commanders to inspect the caps by disassembling them and examining the hinge pin. If the hinge pin was damaged or corroded that bulletin directed that it be replaced.

On March 9, 1973, the FAA issued an Airworthiness Directive (AD) which required the owners of Aero Commanders with military specification fuel caps to replace them with non-siphoning fuel caps. The AD required compliance within two hundred flight hours.

In November, 1973, Crow serviced the Aero Commander involved in this action for its former owner. At the same time, Crow conducted the annual inspection required by the FAA. This plane had a military specification fuel cap. Crow had only one mechanic who was authorized to certify the inspection, William Tanner. He was required to familiarize himself with all the service bulletins for the planes he inspected. Tanner testified Crow did not have Rockwell's service bulletins for the Aero Commander 520, but said he borrowed them from another fixed base operator. These bulletins required inspection of the fuel cap. Crow admitted in its answers to interrogatories that it did not have knowledge of the AD which required replacement of the military specification fuel cap, but Tanner contradicted this and testified that he told the

Aero Commander's pilot about the AD. Tanner certified the inspection although he did not personally inspect the fuel cap. He said that if he had inspected the fuel cap he would have been concerned by its corroded condition.

Ten flight hours after Crow serviced the plane, a mechanical engine failure forced its pilot to make an emergency landing at Neosho, Missouri. The damaged engine was replaced by the Neosho Flying Service.

While the plane was at Neosho, Crow purchased it as a trade-in. Rimer went to Neosho to ferry the plane to Crow's base at Toledo, Ohio. When Rimer arrived at Neosho, he spoke to the plane's former pilot. The pilot told Rimer about the plane's flight characteristics and warned him that the fuel gauges were erratic. He did not tell Rimer about the AD which required replacement of the fuel cap, although he knew about it.

Rimer examined the Aero Commander's maintenance manual before he left Neosho. He familiarized himself with the fuel system and knew that the fuel cap had to be securely fastened for safe flight.

When the plane was fueled the "line boy" (fueler) could not get the fuel cap to come off. Rimer was standing by the plane at this time. The fueler called the mechanic who worked for Neosho Flying Service to remove the cap. The mechanic climbed on the wing and removed the cap with a screwdriver. He broke the cap's hinge pin when he removed the cap. Rimer saw the mechanic remove the cap, but there was conflicting testimony about whether the fueler told Rimer that the cap was rusty and that it spun freely but would not come off.

Rimer performed a walk around inspection while the plane was being fueled. The refueling ladder was near the plane, but Rimer did not use it to personally inspect the fuel cap. Instead, he looked at the fuel cap from the ground while he was standing behind the plane's tail. Rimer testified he was trained to remove the fuel cap and check the fuel supply. He also testified that pilots were generally taught to remove

the cap during preflight inspection. However, there was testimony that most Aero Commander pilots do not remove the cap during preflight inspection because it is too high to be reached easily.

In spite of the problem with the fuel cap, Rimer did not ask the mechanic what he had done. There was testimony that fuel caps frequently stuck on airplanes and that this was not unusual. However, the fueler testified that Rimer had an "I don't care" attitude when he was told about the problem with the fuel cap. Rimer was in a hurry to take off because Crow told him not to fly at night. In addition, the weather was deteriorating at Neosho. Rimer checked the fuel gauge before he took off. It indicated that the tanks were full. This amount of fuel was more than ample to reach Toledo, Ohio.

Two hours after Rimer took off, the plane suddenly lost power in both engines. The fuel gauges indicated that the tanks were half full. Rimer was forced to land in a cornfield. His back was fractured in the landing. After the landing, Rimer saw the fuel cap hanging from its chain. The cap's hinge pin was broken.

Rimer and Crow filed separate actions against Neosho Flying Service and Rockwell. The action against Neosho Flying Service was settled before it went to trial.

The complaint in the action against Rockwell alleged that Rockwell was strictly liable for the dangerous defects in the military specification fuel cap and the Aero Commander 520's fuel system. It also alleged that the system was negligently designed. The complaint asserted that Rockwell was willfully and wantonly negligent because it failed to warn the pilots of Aero Commanders about these defects. Rockwell's answer raised affirmative defenses based on Rimer's and Crow's contributory negligence and assumption of the risk. Rockwell also asserted that the negligence of Neosho Flying Service was a superseding cause of the accident.

Before the trial, Rockwell filed a motion for summary judgment and a motion *in*

*limine.* The motion for summary judgment alleged that Rimer was contributorily negligent as a matter of law and that the condition of the fuel cap was substantially changed because the hinge pin was broken at the time of the accident. The district court denied the motion for summary judgment.

The motion *in limine* requested the court to require Rimer to demonstrate the relevance of any evidence of prior accidents involving Aero Commanders. The district court tentatively granted the motion *in limine* and ordered Rimer not to present any evidence of prior accidents involving Aero Commander airplanes unless they involved accidents in which the fuel caps had a broken hinge pin. As a result, the district court excluded evidence of 24 prior accidents involving Aero Commanders.

After Rockwell presented its evidence, the district court granted a partial directed verdict. It held that Rimer was contributorily negligent as a matter of law. As a result, the claim of negligent design was barred. The district court also held that there was no evidence of willful and wanton negligence and struck the claim for punitive damages. Once the claim for willful negligence was stricken, Rimer's contributory negligence barred his claim for negligent failure to warn.

The case went to the jury on the strict liability claim alone. The jury returned a verdict for Rockwell.

## II.

Rimer contends that the district court erred in ruling that he was contributorily negligent as a matter of law. We agree.

When the district court granted the directed verdict it held "that the failure to inspect the gas cap when Mr. Rimer knew or should have known of a difficulty with it, is contributory negligence as a matter of law." It is not clear whether this holding was based on negligence *per se*[1] or if the

district court believed that a directed verdict was appropriate because Rimer had not presented enough evidence to raise a fact issue on the question of his contributory negligence.

Rockwell asserts that this ruling was correct. It relies on *Bibler v. Young*, 492 F.2d 1351 (6th Cir. 1974), and *Sullivan v. United States*, 299 F.Supp. 621 (N.D.Ala.1968), *aff'd*, 411 F.2d 794 (5th Cir. 1969). Both these cases involved negligence *per se* ; neither is on point.

In *Bibler*, a pilot who was involved in a midair collision failed to maintain radio communications with the airport control tower while he was in an airport traffic area. FAA regulations specifically forbid the operation of an aircraft in an airport traffic area unless two-way radio communications are maintained between the control tower and the aircraft. Because the pilot did not comply with the regulation he was negligent *per se.*

In *Sullivan*, the pilot did not check his fuel supply before he took off on a night flight. He was forced to land at an airport without runway lights because he had not refueled his plane and it did not have enough fuel to fly to an alternate destination. FAA regulations provide that planes flying at night must have enough fuel to reach their first intended landing point plus enough fuel to fly for an additional hour.

■ The relevant facts in this case are far different from either *Bibler* or *Sullivan.* In both of those cases specific directives of the FAA were disregarded. In this case, the regulations relied on by Rockwell provide only general standards of conduct; they do not impose a specific duty on a pilot to do a particular act. For example, Federal Aviation Regulation (FAR) 91.3(a) provides: "The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. § 91.3(a) (1978). FAR

---

1. A failure to perform a specific requirement of a statute or ordinance is negligence *per se.* "[W]here a legislative enactment imposes upon a person a specific duty for the protection of others, his failure to observe that duty constitutes negligence per se." *Taylor v. Webster*, 12 Ohio St.2d 53, 56, 231 N.E.2d 870, 872 (1967).

91.29 states "(a) No person may operate a civil aircraft unless it is in airworthy condition, (b) the pilot in command of a civil aircraft is responsible for determining whether that aircraft is in condition for safe flight." 14 C.F.R. § 91.29 (1978). These directives are general in nature and do not create specific duties. There are no regulations which specifically require a pilot to check the physical security of the fuel cap by physically removing it. In the absence of this type of regulation Rimer was not negligent *per se.*[2] *Cf., Ornella v. Robertson,* 14 Ohio St.2d 144, 237 N.E.2d 140 (1968).

■ Rimer presented enough evidence on the issue of contributory negligence to make the grant of a partial directed verdict inappropriate. The issue raised by a motion for a directed verdict is whether there is sufficient evidence to raise a question of fact for the jury. The trial court cannot weigh the evidence or substitute its judgment for that of the jury. All reasonable inferences must be drawn in favor of the nonmoving party. *Cf., Morelock v. NRC Corp.,* 586 F.2d 1096, 1104 (6th Cir. 1978).

Ohio law supports the conclusion that the district court erred in finding that Rimer was contributorily negligent as a matter of law. In *Lazar v. Cleveland Electric Illuminating Co.,* 43 Ohio St.2d 131, 331 N.E.2d 424 (1975), the Supreme Court of Ohio reversed a decision of the Ohio Court of Appeals which held that a plaintiff was contributorily negligent as a matter of law. The Court stated:

> A finding of contributory negligence on the part of a plaintiff involves the interplay of complex, and perhaps contradictory, factors. In addition to the knowledge imputed to the plaintiff, one must consider any special knowledge on his part, any external indicia which warns of danger, the culpability of defendant, and the totality of circumstances under which the accident occurred. These are considera-

tions uniquely tailored to the jury function. Absent evidence so clear that reasonable minds could not differ with regard to it, a holding that conduct is contributorily negligent as a matter of law is improper. *Id.* 43 Ohio St.2d at 144, 331 N.E.2d at 433.

In this case there were many fact questions to be resolved by the jury before Rimer could be found contributorily negligent. It is unclear whether Rimer "knew or should have known" of the defective condition of the fuel cap. There was testimony that fuel caps frequently stick to the fuel spout and there was no evidence that anyone actually warned Rimer that the cap was likely to come off because of its damaged condition. In addition, it is uncertain whether pilots of Aero Commanders normally check their fuel caps by physically removing them and whether the failure to check a cap in this way is negligent. If pilots could easily discover defective fuel caps Rockwell's service bulletin which required this type of inspection would have been unnecessary. Rimer's alleged contributory negligence presented fact questions to be resolved by the jury, not the court.

■ The district court also erred in holding that Rimer had presented no evidence of willful and wanton negligence. Under Ohio law willful misconduct is proved by showing "all absence of care or an absolute perverse indifference to the safety of others, knowing of a dangerous situation, yet failing to use ordinary care to avoid injury to others." *Roszman v. Sammett,* 26 Ohio St.2d 94, 98, 269 N.E.2d 420, 423 (1971). In this case, the Rockwell memorandum issued at the same time as the non-siphoning cap custom kit reveals that Rockwell had notice of the danger of fuel siphoning and that it did not issue a service bulletin which required replacement of the fuel caps because it was afraid of encouraging litigation. This is sufficient to raise a fact issue for the jury on the issue of willful

---

2. In *Ornella v. Robertson,* 14 Ohio St.2d 144, 237 N.E.2d 140 (1968), the Supreme Court of Ohio distinguished safety statutes which provide specific standards of conduct and those

which provide general standards of conduct. A finding of negligence *per se* requires a violation of a statute which sets out a specific standard of conduct.

negligence. Because the issue of willful negligence should have been left to the jury, the claim for negligent failure to warn should have gone to the jury even if Rimer was contributorily negligent; contributory negligence is not a defense to willful misconduct. *Hawkins v. Ivy*, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977).

■ The district court also erred in excluding evidence of all but one of the prior accidents involving Aero Commanders.

Rimer sought to introduce evidence of 25 accidents involving Aero Commanders. The district court ruled that evidence of only one of these accidents was admissible. It held that the only accident which was substantially similar to Rimer's accident was one which was caused by a fuel cap with a broken handle attach pin.

In *Prashker v. Beech Aircraft Corporation*, 258 F.2d 602 (3rd Cir.) *cert. denied*, 358 U.S. 910, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958), a case which dealt with the admissibility of other aircraft accidents, the Third Circuit approved a two-step test to determine the admissibility of other aircraft accidents. "[O]nce it [the district court] had initially determined what models for purposes of the case were identical and which reports could therefore be relevant and material ... [it then had to] decide whether the accident reports were relevant on the issues for which they were offered." 258 F.2d at 608. This is the correct test.

The district court read the allegations of the complaint too narrowly in determining which accidents were relevant to the issues raised in the complaint. As a result, it held that prior incidents of fuel siphoning were not relevant unless they were caused by fuel caps with broken hinge pins. However, Rimer's amended complaint states: "The design of ... [the] fuel system and gas cap was defective in using a single gas intake to supply two engines and five separate tanks, leaving the systems without any backup safety features permitting one engine to operate independently in case of loss of fuel." Prior accidents in which all of an Aero Commander's fuel was siphoned through a single gas intake are relevant to this issue and evidence of them should have been admitted.

Some of the evidence Rimer sought to introduce does not meet the test set out in *Prashker*. For example, Aero Commanders with auxiliary fuel tanks which are independent of the unitized fuel system are not identical aircraft. However, the district court excluded evidence of a number of accidents which were caused by fuel siphoning in Aero Commanders with interconnected fuel tanks and a single gas intake. These accidents were relevant in determining whether a design defect existed and whether Rockwell was negligent because it failed to warn about the defect.

The exclusion of this evidence was prejudicial to Rimer and substantially affected his rights. A jury would be far more likely to find that a design is defective if it learns that the alleged defect resulted in a number of accidents. Consequently, the jury's verdict must be vacated. *Crown Cork & Seal Co. v. Morton Pharmaceuticals, Inc.*, 417 F.2d 921 (6th Cir. 1969).

■ The district court did not err in excluding the opinion testimony of an experienced pilot on the design of the Aero Commander's fuel system. The alleged expert, Paul Vance, was permitted to testify extensively about his experiences as a pilot and about the experiences of other pilots. He also testified about a forced landing he made in an Aero Commander as a result of fuel siphoning. The court properly excluded Vance's opinion that the Aero Commander's fuel system was defectively designed. There was no abuse of discretion here. *Krentz v. Union Carbide Corp.*, 365 F.2d 113, 119 (6th Cir. 1966).

On remand, evidence which bears on Rockwell's knowledge of prior incidents of fuel siphoning will be relevant in determining if Rockwell was negligent because it failed to warn about fuel siphoning.

In view of our resolution of these issues, it is unnecessary to consider Rimer's other contentions.

REVERSED and REMANDED.